**James R. OHSE, Plaintiff-Appellant,**

v.

**Michael HUGHES, et al.,
Defendants-Appellees.**

No. 85–3074.

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1986.

Decided April 1, 1987.

As Amended April 15, 1987.

Rehearing Denied May 14, 1987.

Joseph D. Pavia, Kirtley-Pavia-Narsh, Urbana, Ill., for plaintiff-appellant.

Gabriel M. Rodriguez, Asst. Atty. Gen., Chicago, Ill., Steven M. Helm, Durkes O'Rourke, Stewart, Martin & Helm, Ltd., Danville, Ill., Marty R. Schnorf, State's Attys. Office, Toledo, Ill., for defendants-appellees.

Before CUDAHY and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.*

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

WILLIAM J. CAMPBELL, Senior District Judge.

Plaintiff-appellant James Ohse appeals the dismissal of his action brought in the United States District Court for the Central District of Illinois. Ohse claims he was wrongfully terminated from his position as an Illinois Adult Probation Officer and that the termination violated various rights which he was entitled to under the United States and Illinois Constitutions and Illinois state law. Seven individuals and entities are named as defendants in this action. Included are the Illinois Counties of Coles and Cumberland, Chief Probation Officer Michael Hughes, State's Attorney Nancy Owen, and Illinois Circuit Judges William Sunderman, Joseph Spitz and Paul Komada. The district court had jurisdiction over several counts in this suit pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343. Pendent jurisdiction was exercised over the state claims. Cross-motions for summary judgment were filed. The district court granted defendants' motion for summary judgment as to all the federal claims. Thereafter, pursuant to *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and *Benson v. Cody*, 761 F.2d 335 (7th Cir.1985) the pendent state law claims were dismissed as well.

### *Factual Background*

The relevant facts are as follows. On December 12, 1977 James Ohse was appointed as an Adult Probation Officer in an office headed by Michael L. Hughes, Chief Adult and Juvenile Probation Officer for Coles and Cumberland Counties, Illinois. In either late 1980 or early 1981 friction developed between Ohse and Hughes. There is some testimony that the friction was prompted in part by the promotion of a fellow employee, Vickie Starwalt, to the position of Deputy Chief Probation Officer. In any event, by the spring of 1981 Ohse and Hughes spoke to each other only when necessary.

In April of 1982 Hughes approached Ohse about complaints he had received regarding Ohse. By May, 1982, the situation degenerated to the point where Hughes and Ohse had a confrontation at a staff meeting which was marked by name calling. On May 24, Ohse countered by conversing with two fellow employees about illegal and improper conduct at the Coles-Cumberland Probation Office. Ohse informed them that there had been alcohol consumed during business hours in the office by Hughes and others. Ohse also revealed that Hughes had directed employees to report meal expenses as mileage expenses for reimbursement purposes. The next day Hughes held a staff meeting and admitted the incidents of drinking on the job and the falsifying of mileage reports. Hughes stated, "... we'll all start fresh, we'll all start anew from this point." (See Hughes Deposition at p. 35). Soon thereafter Hughes revised the office policy manual and wrote a letter to Chief Circuit Judge Ralph Pearman indicating he intended to abide strictly by the rules therein. The Circuit Court has supervisory authority over the probation office, including the power to hire and fire personnel, pursuant to Ill.Rev.Stat. ch. 38, §§ 204–1 *et seq.* (see *infra*).

In June, 1982, Hughes had the opportunity to evaluate Ohse's work performance. Ohse was rated as "adequate" to "exceptional." On August 11, Ohse complained about the evaluation in a memorandum to Hughes. Ohse especially wanted to know why he had been rated only "adequate" in certain areas.[1]

On November 23, Ohse filed a 17 page grievance with Hughes pursuant to the established office grievance procedure. The grievance detailed their tumultuous personal history and questioned the veracity of Hughes' claim that he had received complaints about Ohse from employees at the State's Attorney's Office. Hughes responded to Ohse's grievance by meeting with three of the defendants in this case:

---

1. We note Ohse claims Hughes told him, prior to the evaluation, that he had received complaints about Ohse from employees of the State's Attorney's Office. Ohse asserts he questioned those employees and they all denied ever complaining to Hughes.

Circuit Judges Spitz, Sunderman and Komada. Hughes asked the judges what he should do. They replied Hughes' evaluations were acceptable and nothing further need be done. Thereafter, on December 2, 1982, Hughes told Ohse his grievance lacked merit. On December 11, a dissatisfied Ohse took his grievance to Judge Pearman. Thereafter, on December 22, Ohse sent a memorandum addressed "To Whom It May Concern" to Pearman, the three defendant judges, selected County Board members and the Coles County State's Attorney's Office. The letter alleged the following improper conduct from the Hughes-headed probation office: 1) misuse of mileage vouchers to cover meal expenses; 2) abuse of sick and vacation time; 3) misappropriation of money budgeted for office expenses; 4) abuse of authority concerning Hughes' obtaining of a hospital's records for personal use; 5) miscellaneous other violations such as the allowing of employees to sleep on the job and secretaries to do personal typing during business hours. Ohse's letter called for an investigation and the filing of criminal charges.

On December 27, defendant Nancy Owen, State's Attorney for Coles County, informed Ohse by letter that criminal charges would not be filed against Hughes. On the next day, December 28, Judge Pearman informed Hughes that he believed Hughes' defenses to the Ohse allegations were sufficient and that nothing further would be done. On January 3, 1983 Hughes suspended Ohse. He also requested Ohse's termination, alleging various acts of insubordination.[2] On January 6, Judge Pearman appointed defendant Judges Sunderman, Spitz and Komada to investigate Hughes' request to terminate Ohse. A hearing was held on February 1. On February 2, a written decision was issued terminating Ohse.

On March 16, 1983, Ohse filed the instant action in the district court. The district court broke down his various claims into four areas. First, Ohse alleged his termi-

nation violated his due process rights under the Fourteenth Amendment of the United States Constitution. He claimed he was deprived of property and liberty interests due to the manner in which he was terminated. Second, Ohse claimed his discharge violated his First Amendment rights to freedom of expression under the United States Constitution. Third, Ohse claimed he was denied his right to equal protection under the Fourteenth Amendment. Finally, Ohse asserted various claims under the Illinois Constitution and Illinois law. We shall discuss each claim as presented above.

## I—*Due Process Claims*

### A. *Property Interest Claim*

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) is the seminal case setting forth the current analysis to employ when ascertaining if a person has a property interest in a public sector employment position. In *Roth*, the Court recognized the now longstanding principle that a person may have a sufficient interest or expectation in a government benefit (see *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)) or a position of public employment (see *Slochower v. Board of Education*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956)) to be deemed to have a property interest in that position safeguarded by the due process clause of the Fourteenth Amendment. When such a situation arises, summary termination or separation of the person from that interest is unconstitutional. Instead, a hearing or inquiry into the merits behind the proposed termination is necessary to meet Fourteenth Amendment due process requirements. This hearing ensures the person is separated from the entitlement only for good cause. When good cause is demonstrated by a separate and fair hearing, a person is deemed to have received all the process that he or she is due. In ascertain-

---

**2.** This procedure is pursuant to the statutory scheme found at Ill.Rev.Stat. ch. 38, § 204–5

(see *infra*).

ing whether a property interest attaches to a particular situation the *Roth* court stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.... Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

92 S.Ct. at 2709.

Indeed, in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) the Court declared:

> A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law. (Footnotes omitted).

96 S.Ct. at 2077.

■ Turning to Illinois law, did Ohse have a legitimate claim of entitlement to his position as an Adult Probation Officer which would create a property interest as described above? We answer in the negative. In *Levin v. Civil Service Commission of Cook County*, 52 Ill.2d 516, 288 N.E.2d 97 (1972), the Supreme Court of Illinois explicitly stated:

> As to the status of a public employee, this court has held that a person has no property right in public employment.

(*People ex rel. Akin v. Kipley*, 171 Ill. 44, 77, 49 N.E. 229; *People ex rel. Akin v. Loeffler*, 175 Ill. 585, 606, 51 N.E. 785; *Elder v. Mall*, 350 Ill. 538, 542, 183 N.E. 578). This court has likewise held that a public employee has no property right in public employment which falls within the protection of the due-process clause of either the State or Federal constitution. *Pickus v. Board of Education*, 9 Ill.2d 599, 606, 138 N.E.2d 532; *Jordan v. Metropolitan Sanitary Dist.*, 15 Ill.2d 369, 155 N.E.2d 297.

288 N.E.2d at 100.

We also note the language of Ill.Rev. Stat. ch. 38, § 204–1 which stated in pertinent part during the relevant time pertaining to this lawsuit:

> The circuit court of each of the several counties in this State may appoint a probation officer to act as such for and throughout the county to which he shall be appointed. The circuit court of any county may appoint such number of additional probation officers for such county as the court may deem to be necessary or advisable. Any circuit court may also, in its discretion appoint a chief probation officer, deputy chief probation officers, and supervisors, in addition to the number of probation officers appointed.... *The probation officers* shall serve as such from the date of their appointment, *shall be subject to the orders of the courts appointing them, and removable in the discretion thereof* by an order duly entered of record. (Emphasis added).[3]

■ Ohse claims Ill.Rev.Stat. Chapter 38, § 204–5 mandates that he only be fired "if good cause existed for his termination." (Ohse brief, p. 10). Section 204–5 reads in pertinent part:

---

**3.** Section 204–1 has been repealed, effective January 1, 1986. Ill.Rev.Stat. ch. 38, Section 204–5 (*infra*) has been amended and rewritten effective January 1, 1986, however there is no indication this section should be applied retroactively to fit Ohse's situation. [See *Union Pacific Railway Company v. Laramie Stockyards Company*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913), "the first rule of construction is that legislation must be considered as addressed to

the future, not to the past ... a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislation.'" (quoting *United States v. Heth*, 7 U.S. 399 (3 Cranch 399), 2 L.Ed. 479 (1806)) (quoted in *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964))].

Any Chief Probation Officer shall have authority to suspend any Probation Officer under his supervision for a period of not exceeding thirty (30) days, but may not discharge, and it shall be the duty of such Chief Probation Officer promptly to file charges against any Probation Officer so suspended by him, with the Court or Judges appointing such Probation Officer, and said Court or Judges shall thereupon investigate said charges and may hear evidence, and *shall act thereon as the interest of justice and the good of the probation service may require.* (Emphasis added).

We find Ohse's argument unpersuasive. The language of *Levin* explicitly rejects any notion that public employees in Illinois are presumed to have a property interest in their positions. Further, the language in section 204–1 *supra* clearly states probation officers serve at the discretion of the state circuit court. As Ohse himself points out in his brief, the rules of statutory construction dictate that words in a statute be given their plain and ordinary meaning. (Ohse Brief, p. 9). By invoking this rule of construction this court is lead to the inescapable conclusion that section 204–1 and *Levin* clearly indicate that Ohse had no property interest in his position at the probation office. Ohse's reading of section 204–5 as mandating his termination be for good cause only is (arguably) a reasonable interpretation, but not necessarily the only interpretation to be had from the language of the section.[4] Since the plain and explicit

language of section 204–1 allows removal of Ohse at court discretion, we are unwilling to usurp the plain meaning of that language with Ohse's interpretation of section 204–5.

■ The Illinois Personnel Code at Ill. Rev.Stat. ch. 127, § 63b104a & c is supportive of this ruling. While recognizing Ill. Rev.Stat. ch. 127, § 63b108b.16 requires certain state employees be fired only for cause and only after notice and prior hearing, we note § 63b104a & c lists certain groups of employees as exempt from such treatment. "Employees of the courts" are included among the exempt groups.[5] Undoubtedly Ohse is an employee of the court, as the district court concluded. This point also nullifies Ohse's argument under Article VI, Section 18(b) of the Illinois Constitution for Ohse must consider himself to be a judicial officer of the Circuit Court in his position as Adult Probation Officer.[6]

We have considered Ohse's miscellaneous other arguments as to why he had a property interest in his position and find them unpersuasive. Even assuming *arguendo* that Ohse had a property interest in the instant case, we close our discussion in this section by wondering aloud where a due process violation could be considered to have occurred? Indeed, conspicuously absent from the arguments of both sides in this case is the fact that Ohse did receive a February 1, 1983 hearing before three (now defendant) judges of the state circuit court

4. Indeed one could argue a situation could arise where a person could be fired without cause because "the interest of justice and the good of probation service" requires such a move, although we do not mean to suggest we find this argument any more persuasive.

5. Ill.Rev.Stat. ch. 127, § 63b104a reads in pertinent part:
Definition of jurisdictions. There are hereby created three separate areas of personnel jurisdiction of the Department of Central Management Services, as follows:
(1) Jurisdiction A, with respect to the classification and compensation of positions in the State service.
(2) Jurisdiction B, with respect to the positions in the State service to which persons must hold appointments on a basis of merit and fitness.

(3) Jurisdiction C, with respect to conditions of employment in State service.
Ill.Rev.Stat. ch. 127, § 63b104c reads in pertinent part:
General exemption. The following positions in State service shall be exempt from jurisdictions A, B, and C, unless such jurisdictions shall be extended as provided in this Act:
(3) Judges and officers and employees of the courts, and notaries public.

6. Article VI, Section 18(b) of the Illinois Constitution states:
"The General Assembly shall provide by law for the election, or the appointment by Circuit Judges, or clerks and other non-judicial officers of the Circuit Courts and for their terms of office and removal for cause."

prior to his discharge. At this hearing Ohse was represented by aggressive counsel who filed several motions. Ohse was also allowed to testify and present documentation and cross-examine witnesses. All this occurred at a hearing held several months after Ohse had initiated a grievance against Hughes pursuant to a delineated procedure and had distributed a letter to the circuit judges, selected county board members and the state's attorney's office outlining the issues we discuss here today. Hence the judges presiding at the February 1 hearing cannot be said to have been ill-informed or unprepared to make a ruling on the matter. The impression Ohse leaves is that anything less than a jury trial is insufficient—assuming *arguendo* he has a property interest in his position in the first place. Certainly Ohse has no constitutional entitlement to a jury trial in this situation.

## B. *Liberty Interest Claim*

■ Ohse asserts there is an issue as to whether his termination deprived him of a liberty interest under the Fourteenth Amendment. We disagree. In order to establish a deprivation of a liberty interest, a plaintiff must advance evidence that the State seriously damaged his standing and associations in the community through allegations of, for example, dishonesty·or immorality. *Roth*, 92 S.Ct. at 2707. The resulting effect should be of sufficient severity that the plaintiff has trouble finding other employment opportunities. *Id.*[7] Ultimately, an individual must be deemed to be deprived of "... the right ... to contract ... (or) engage in any of the common occupations of life...." *Id.*

No doubt Ohse suffered some degree of negative stigmatization from his discharge but that is inevitable in any discharge and does not necessarily amount to a constitutional deprivation. As we stated in *Lipp v.*

*Board of Education of City of Chicago,* 470 F.2d 802, 805 (7th Cir.1972):

> ... not every remark which may arguably affect one's reputation violates due process if made by a government official without a hearing, for the fourteenth amendment protects only against charges that 'might seriously damage [one's] standing and associations in his community'.

(Citing *Roth*, 92 S.Ct. at 2707) (Cited with approval in *Hadley v. County of DuPage,* 715 F.2d 1238, 1245 (7th Cir.1983)).

In *Munson* we concluded:

> A liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or protracted interruption of employment.

*Id.* at 693 (citing *Stretten v. Wadsworth,* 537 F.2d 361, 366 (7th Cir.1976)).

We do not believe Ohse has alleged any persuasive facts which would lead us to conclude a liberty interest deprivation occurred here. Ohse admits he found employment after his termination (Ohse Dep., Doc. 66, pp. 24–25). Further, no significant evidence is advanced by Ohse that his discharge seriously damaged his associations or reputation in the community. Indeed, the evidence suggests otherwise. Subsequent to his discharge at the probation office Ohse, while employed, apparently pursued a masters degree in business administration at a reputable state university. The district court correctly dismissed Ohse's liberty interest claims.

## II—*First Amendment Claim*

■ Ohse's First Amendment claim presents more perplexing questions. The criteria to employ here are well established by three cases: *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d

---

7. In *Munson v. Friske,* 754 F.2d 683, 693 (7th Cir.1985) we summarized *Roth*'s teachings as follows:

> In interpreting the Supreme Court's holding in *Roth,* this court has held that a liberty interest is implicated when either (1) the individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, alcoholism, disloyalty, Communism or subversive acts; or (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities.

708 (1983) and *Knapp v. Whitaker,* 757 F.2d 827 (7th Cir.1985) (Coffey, J.). *Pickering* teaches us that to determine whether Ohse's speech was constitutionally protected we must employ a two step analysis. First, we must decide whether Ohse's speech "is a matter of public concern" in which "debate is vital to informed decision-making by the electorate." *Pickering,* 88 S.Ct. at 1736. The district court ruled the speech was of public concern and we see no reason to reach a different conclusion. After all, Ohse detailed serious abuses in a publicly funded probation office which were later admitted by the chief of the office to be true. Ohse revealed the drinking of alcohol by probation employees during business hours, the falsifying of mileage charges to cover meal expenses, the inappropriate taking of sick and vacation days, situations where Hughes misappropriated public funds for unauthorized uses, and members of the office sleeping on the job. It is clear to us, as it was to the district court, that the above matters are of public concern which would trigger "debate ... vital to an informed decision-making electorate." *Id.* Having determined the speech of public concern, the next step, according to *Pickering,* is to employ a balancing test best described by Judge Coffey in *Knapp:*

> If the speech is deemed a matter of public concern, the court must then engage in the *Pickering* balancing test, weighing the interest of the public employee, as a citizen, in commenting upon matters of public concern with the interest of the State, as an employer, in promoting effective and efficient public service.

757 F.2d at 839.

Several factors should be considered in this analysis, such as:

> (1) whether the speech impeded the employee's ability to perform her responsibilities; (2) the importance of close working relationships with superiors and co-workers; (3) the time, place, and manner in which the speech was delivered; and (4) the context in which the underlying dispute arose.

*Id.*

Ultimately, however, the *Pickering* court recognized that:

> Because of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their supervisors, against whom the statements are directed to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged.

88 S.Ct. at 1734–35.

At this point, for purposes of comparison and perspective we turn to the fact patterns and analysis surrounding the *Connick* and *Knapp* cases. In *Connick* the allegedly aggrieved employee was named Sheila Myers. Myers held a position as an Assistant District Attorney. Upset over her proposed transfer to another office she spoke to one of her superiors about the matter. Unsatisfied with the results, she prepared an office questionnaire and then distributed it in-house to 15 Assistant District Attorneys. The questionnaire asked the staff its opinion on the office transfer policy, office morale, the desirability of creating a grievance committee, the degree of confidence in the supervisory staff, and whether it was felt there was pressure to work on the political campaigns of office supported candidates. District Attorney Harry Connick, Myers' boss, considered the questionnaire an act of insubordination and discharged Myers. Myers concluded the questionnaire triggered her termination and therefore abridged her First Amendment right to speak freely. Connick claimed the termination was because Myers refused to accept the transfer. The Supreme Court rejected Myers' argument, reversing the rulings of the lower tribunals. It reasoned:

> Myers' questionnaire touched upon matters of public concern in only a most limited sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amendment interest involved here does not require that Connick tolerate action which

he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Myers' discharge therefore did not offend the First Amendment.

103 S.Ct. at 1693–94.

The *Connick* Court continued:

> In this case, with but one exception, the questions posed by Myers to her co-workers do not fall under the rubric of matters of "public concern." We view the questions pertaining to the confidence and trust that Myers' co-workers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of Myers' dispute over her transfer to another section of the criminal court. Unlike the dissent, *post,* at 1698, we do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official. *Myers did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoings or breach of public trust on the part of Connick and others.* Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo. While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause célébre. (Emphasis added).

103 S.Ct. at 1690–91.

In the case at bar, we disagree with the district court that *Connick* compels us to reach the conclusion that Ohse's speech was unprotected. We are of the opinion that Ohse's "To Whom It May Concern" letter, distributed to various figures in positions of public trust, was more focused upon issues of public concern than Myers' in-house office questionnaire. The *Connick* Court found only one of Myers' questions of public concern. This cannot be compared to the several questions of public concern raised by Ohse. Further, Ohse's actions were not as disruptive to the management of his office as Myers' questions/actions were to hers. The Hughes abuses delineated by Ohse were probably generally recognized by a significant percentage of the office personnel (if not all personnel). Additionally, Myers' questionnaire was distributed in-house and doubted the integrity and competence of the supervisory staff in general. Ohse's grievances were taken out of the office and attacked only Hughes' performance as office leader. The "To Whom It May Concern" letter may have disrupted the office, undermined Hughes' authority, and hindered close working relationships in a manner which may best be described as inevitable; however, we believe that the matters the letter addressed were of high public concern and that Ohse was entitled to raise these important issues as he did.

■ Interestingly, it was only six days after Judge Pearman informed Hughes that his defenses to the Ohse allegations were adequate that Hughes suspended Ohse, triggering the process that would lead to Ohse's termination.[8] Before this event, Hughes had rated Ohse's professional competence as "adequate" to "exceptional." In sum, in this case we conclude Ohse's interest as a citizen in commenting on these matters of public concern outweighs the State's interest in promoting an efficient and effective working environment. The *Pickering* balancing test weighs toward Ohse's interests and therefore we rule his speech was constitutionally

---

**8.** Arguably it was less than six days since one of those six days was New Year's Day and there- fore not a working day.

protected, reversing the district court here.[9]

The facts of the *Knapp* case closely parallel those in the case at bar, although they are not as similar as the facts of *Atcherson*. In *Knapp* this court affirmed the district court ruling that plaintiff Knapp's speech on certain issues was constitutionally protected. This enabled Terry Knapp, a school teacher, to take his case to the jury, which ultimately granted him an award for damages. Yet it can hardly be comfortably concluded that Knapp's speech was less disruptive to the school system that employed him than Ohse's speech was to his probation office. The *Knapp* court summarized:

> The record indicates that Knapp contacted School Board members concerning his classroom assignment; the content of administrative assistant Hatton's evaluations; the inequitable mileage allowance for Woodruff coaches; the liability insurance provided by Peoria School District No. 150 for coaches and volunteer parents who transport student-athletes to school-related activities; and the general ineffectiveness of the grievance procedure within District 150.

757 F.2d at 840.

The record also indicates Knapp consistently avoided following established grievance procedures and chains of command while contacting the School Board. Indeed, Knapp delivered an 11 page statement to the Board (not unlike the Ohse "To Whom It May Concern" letter) describing his school's policies and actions. Even Knapp's union representative called at least one of Knapp's five grievances without merit. School principal Russell McDavid labeled this conduct disruptive and insubordinate, not unlike as Hughes has done in the instant case.

Not all of Knapp's issues of concern were deemed of public concern by the court. However, when the *Pickering* balancing test was employed by the *Knapp* court, Knapp's interests were deemed to have priority. Not insignificantly, the *Knapp* court stated:

> The initial, and often determinative, question is whether the speech interferes with the employee's work or with the efficient and successful operation of the office. Knapp's speech clearly did not interfere with his teaching responsibilities, as Knapp continued to teach in the science department at Woodruff High School for more than a year after he spoke with the School Board members.

757 F.2d at 842.

We are unconvinced there is sufficient evidence to conclude at this point that Ohse's speech interfered with his responsibilities at the probation office. Several reasons compel such a conclusion. First, before the "To Whom It May Concern" letter, even Hughes rated Ohse's performance "adequate" to "exceptional." Secondly, no significant concrete examples of professional incompetence are ever advanced by Hughes. Thirdly, there is no evidence that Ohse was unable to get along with an unusually large number of fellow employees at the office. The only disruptive result of Ohse's speech and conduct from the evidence advanced is the degenerative effect it had on the already volatile Hughes-Ohse relationship. That is not sufficient to separate the case from *Knapp*, where the plaintiff was allowed to proceed to trial.

In sum, Ohse's speech addressed matters of public concern by unearthing breaches of the public trust. The issues of public concern raised by Ohse were of equal import compared to those found in *Knapp*

9. To this extent we reject the district court's ruling that *Connick* overrules *Atcherson v. Siebenmann*, 605 F.2d 1058 (8th Cir.1979). *Atcherson* concerns a situation factually similar to the case at bar. Esther Atcherson was a probation officer who had strained relations with her boss. Eventually she wrote a letter to Judge Siebenmann stating that if it was her integrity that was at issue, she'd like to reveal some facts about her boss's conduct. She then alleged the office regularly engaged in improper expense reimbursement procedures such as the falsification of mileage expenses to cover other expenses. Soon thereafter, Atcherson was forced to resign. The Eighth Circuit ruled the termination was wrongful and in violation of her First Amendment right to free speech. We agree and note we distinguish *Atcherson* from *Connick* using the same reasoning to distinguish Ohse's case from *Connick* above.

and greater in number than those found in *Connick*. Hence we conclude that Ohse's speech was constitutionally protected as a matter of law.

■ Yet Ohse is still not out of the woods. We must vacate and remand this case back to the district court. As we stated in *Knapp:*

> The initial issue is one of law, whether the plaintiff's speech is constitutionally protected.... If this burden is satisfied, the next question is one of fact, whether the constitutionally protected speech was a substantial or motivating factor in the defendant's actions. If this second burden is satisfied, the third question is also one of fact, whether the defendant defeated the plaintiff's claim by demonstrating that he would have reached the same decision in the absence of the plaintiff's constitutionally protected speech. (Footnotes omitted).

757 F.2d at 827.

Therefore, in order to decide these questions of fact, we believe a remand is appropriate.

### III—*Equal Protection Claim*

■ Ohse claims he was denied equal protection of the laws because other state employees are assured evidentiary hearings before their termination. We reject this contention.

Ohse's attack on the Illinois law that draws a distinction between any process probation officers and other state employees may receive before termination is without merit. Under the traditional equal protection analysis the distinction must have a rational relation to a legitimate state interest. We believe the distinction meets this test. The State could rationally conclude that probation officers are in a position of trust and confidence with the court that justifies discretionary removal. Of course, this recognition of a probation officer's sensitive relationship with the judiciary should not be read to necessarily preclude an individual's First Amendment right to speak freely on issues of public concern, an issue which *Pickering* teaches us should be examined on a case by case basis. We see no constitutional violation in the distinction given to probation office positions.

### *Miscellaneous*

■ In this section we address two final matters. The first is Ohse's argument that the defendant judges do not enjoy absolute immunity in this case. Ohse claims the judges served in an executive as opposed to judicial capacity and therefore are entitled to only good faith immunity and capable of being sued in this case. The district court did not address this issue and therefore on a remand, Ohse believes his counts against the judges should be considered. We disagree and rule the three defendant judges are to be dismissed from this lawsuit as a matter of law.

In *Forrester v. White*, 792 F.2d 647 (7th Cir.1986), *cert. granted,* — U.S. —, 107 S.Ct. 1282, 94 L.Ed.2d 140 (1987), we reflected upon the fact that for several hundred years a judge's judicial "acts" or rulings from the bench on matters within his jurisdiction are entitled to absolute judicial immunity. See 792 F.2d at 650–51, dissent at 660–61. Similarly, in *McMillan v. Svetanoff,* 793 F.2d 149 (7th Cir.1986) we elaborated that:

> It is well established that judges are immune from liability for their judicial acts, even when they act maliciously or corruptly. *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). The purpose of judicial immunity is to protect the public's interest in an independent judiciary. The doctrine of judicial immunity was initially developed in the context of adversarial proceedings where judges decide controversies between parties. *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1871). It has since been extended to any "judicial" act performed by a judge and even to other officials acting in a manner closely aligned with the judicial process. *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Mother Goose Nursery Schools, Inc. v. Sendak,* 770 F.2d 668 (7th Cir.1985), certiorari denied, —

U.S. ——, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986).

The rationale for a doctrine that excludes judges from liability for even intentional and malicious conduct while on the bench is that judges should be free to make controversial decisions and act upon their convictions without fear of personal liability. *Stump*, 435 U.S. at 364, 98 S.Ct. at 1108. It is the concern for principled and fearless decisionmaking that forms the basis for judicial immunity. *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967). But immunity is only granted when essential to protect the integrity of the judicial process. *Briscoe v. LaHue*, 460 U.S. 325, 334–335, 103 S.Ct. 1108, 1115, 1116, 75 L.Ed.2d 96 (1983).

Courts are hesitant and cautious in applying the judicial immunity doctrine to areas outside the traditional adversarial process, such as to quasi-judicial acts. See *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1096–1098, 89 L.Ed.2d 271 (1986). In order for quasi-judicial officials to be granted absolute judicial immunity, their acts must reflect the essence of judicial decision-making and involve discretion of a judicial nature. See *id.*, 106 S.Ct. at 1097; *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Clark v. Washington*, 366 F.2d 678 (9th Cir.1966). Accordingly, only in the most extraordinary cases are executives shielded from damages liability. See *Cleavinger v. Saxner*, [474] U.S. [193], 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985) (citing favorably *Saxner v. Benson*, 727 F.2d at 669, 674 n. 2 [7th Cir.1984] (Cudahy, J., concurring)). We must be equally hesitant in applying the doctrine to judges acting outside the traditional dispute resolution function.

793 F.2d at 150–51.

Surely, the defendant judges in the instant case were involved in a "judicial act" in which they should feel free to render decisions without fear of personal liability. Ohse's hearing had all the elements of a judicial proceeding—counsel was present, witnesses were cross-examined and documentary evidence was received. Impor-

tantly, the judges had no personal or professional interaction with Ohse other than when Ohse initiated the interaction through his own letters addressed to them and, of course, through the hearing. Any interaction by the judges with Hughes concerning Ohse was also done in a judicial manner and can only be considered as judicial in nature. Ohse's argument that the judges were serving in an executive, as opposed to judicial capacity, simply misses the point. As the Supreme Court stated in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

> Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities. This point is underlined by the fact that prosecutors—themselves members of the Executive Branch—are also absolutely immune.

98 S.Ct. at 2913.

Of course, supportive authority for our ruling here today also comes from *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). In *Pierson* a municipal police officer had presided over a criminal case under Mississippi law which resulted in 15 defendants being given sentences of four months in jail and fines of $200. On appeal the County Court reversed the convictions and the cases were dropped. Subsequent to this, the defendants turned petitioners by filing a § 1983 action against the municipal police justice in the United States District Court for the Southern District of Mississippi. The petition asked for damages based on false arrest and imprisonment. The Supreme Court stated:

> We find no difficulty in agreeing with the Court of Appeals that Judge Spencer is immune from liability for damages for his role in these convictions. The record is barren of any proof or specific allegation that Judge Spencer played any role in these arrests and convictions other than to adjudge petitioners guilty when their cases came before his court. Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for

acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine, in *Bradley v. Fisher*, 13 Wall. 335, 20 L.Ed. 646 (1872). This immunity applies even when the judge is accused of acting maliciously and corruptly, and it "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." (*Scott v. Stansfield*, L.R. 3 Ex. 220, 223 (1868), quoted in *Bradley v. Fisher, supra*, 349, note, at 350.) It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.

We do not believe that this settled principle of law was abolished by § 1983, which makes liable "every person" who under color of law deprives another person of his civil rights. The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities. Accordingly, this Court held in *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), that immunity of legislators for acts within the legislative role was not abolished. The immunity of judges for acts within the judicial role is equally well established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine.

87 S.Ct. at 1217–18 (Footnotes and citations omitted).

In sum, for reasons articulated above, we find the role played by the three defendant judges in this action unmistakably judicial in nature and within their jurisdiction. Therefore, we rule the three defendant judges are to be dismissed from the lawsuit.[10]

Finally, we note Ohse has pleaded state law claims which were never addressed by the district court after it dismissed all the federal claims. On remand, these claims should be addressed accordingly.

It It So Ordered.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

I concur in all aspects of the lucid and persuasive majority opinion except for the section finding the judges, Messrs. Spitz, Sunderman and Canada, absolutely immune as a matter of law. It may be that these judges should enjoy absolute immunity, but the district court has never ruled on the matter, and I believe the issue should be remanded to the district court for fact-finding. The root of the problem is that these judges did not act within their "judicial" jurisdiction (as I understand the term). This was not litigation brought before them in normal course for their decision as judges. Rather the question was administrative or executive in nature: whether to discharge an individual with respect to whom the Circuit Court wielded ultimate supervisory authority. *See* Ill. Rev.Stat. ch. 38 §§ 204–1, *et seq.* (1981).

---

**10.** Ohse's cite to *Atcherson v. Siebenmann, supra* as supportive authority is without merit. The *Atcherson* court did not rule, as Ohse suggests, that judges in a position as we find them in the case at bar do not enjoy absolute immunity. Rather, the *Atcherson* court ducked the question stating:

> Assuming without deciding that Judge Siebenmann acted as an administrator and not in his judicial capacity, we hold that he established a qualified immunity defense to damages liability.[8]

Footnote number 8 reads:

> Because of our disposition of the qualified immunity issue, we do not reach Judge Siebenmann's argument that his conduct in terminating Atcherson's employment was cloaked in absolute judicial immunity.

Therefore *Atcherson* does not bolster Ohse's argument here and, more generally, Ohse fails to persuade us there is any significant case law on point supportive of his position.

It is certainly arguable that *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), would support absolute immunity for these administrative acts performed by judges proceeding in a fashion generally associated with a formal adjudication. On the other hand, the judges' acts challenged in the present case relate to the resolution of internal personnel matters rather than to the enforcement against outside parties of agency regulations or statutes as in *Butz. Cf. Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 503, 88 L.Ed.2d 507 (1985) (denying absolute immunity for prison disciplinary committee members functioning as adjudicators in disciplinary proceedings); *Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975) (denying absolute immunity for school board members enforcing disciplinary regulations in the school); *Forrester v. White,* 792 F.2d 647, 653–54 (7th Cir. 1986) (describing cases regarding immunity for judicial personnel decisions), *cert. granted,* —— U.S. ——, 107 S.Ct. 1282, 94 L.Ed.2d 140 (1987).

Despite repeated declarations by the courts that it is function rather than status which controls, *see, e.g., Butz,* 438 U.S. at 511–12, 98 S.Ct. at 2913–14, there seems to me to be a bias in the cases toward granting absolute immunity to judges—even when they are acting in matters of personnel administration, *cf. Forrester v. White,* 792 F.2d at 658–64 (Posner, J., dissenting), *cert. granted,* —— U.S. ——, 107 S.Ct. 1282, 94 L.Ed.2d 140 (1987). On the other hand, there is in the cases a thread of reluctance to recognize absolute immunity where a discharge is at stake, *see id.,* 792 F.2d at 653–54. Finally, there is the important factor of formal adjudicatory procedures as a protection against error, which argues for absolute immunity. *See Butz,* 438 U.S. at 513–14, 98 S.Ct. at 2914–15, *cf. Cleavinger v. Saxner,* 106 S.Ct. at 501.

In the instant case, I believe this is a very close question and fact-finding about the relation of the judges to the plaintiff and about the precise nature of the judges' proceedings might clarify the issue. I would therefore remand on this point and to this extent I respectfully dissent from an opinion which in all other respects I find exemplary.