**Robert SWEENEY, Plaintiff,**

v.

**BOARD OF EDUCATION OF MUNDELEIN CONSOLIDATED HIGH SCHOOL DISTRICT 120, LAKE COUNTY, ILLINOIS and Wayne R. Bottani[1], Defendants.**

**No. 87 C 5527.**

United States District Court, N.D. Illinois, E.D.

July 30, 1990.

---

1. Plaintiff's Complaint and Supplemental Complaint named "Wayne R. Bottani" (now deceased) as a defendant. Later filings on behalf of all defendants (including the decedent) make it apparent that the proper spelling was "Bottoni," so that is the spelling used throughout this opinion except in the caption (which adheres to the original and still unchanged case caption).

Mildred F. Haggerty, Haggerty, Koenig & Hill, Chtd., Chicago, Ill., for plaintiff.

Daniel P. Field, Brydges, Riseborough, Morris, Franke & Miller, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

By way of a four-count complaint (the "Complaint") and a supplemental complaint asserting comparable claims (the "Supplemental Complaint"), Robert Sweeney ("Sweeney") complains of unfair treatment at the hands of his former employer, the Board of Education of Mundelein Consolidated High School District 120 ("Board"), and District 120's then Superintendent of Schools Wayne R. Bottoni ("Bottoni"). Sweeney alleges that Board and Bottoni suspended him, required him to take psychiatric exams and subjected him to a remediation plan as retaliation for his having filed a previous lawsuit—all without due process of law. Sweeney further asserts that those actions violated the tenure provisions of Ill.Rev.Stat. ch. 122, ¶ 24–12 [2] and also constituted the intentional infliction of emotional distress.

Defendants have now moved under Fed. R.Civ.P. ("Rule") 56 for summary judgment on all counts. For the reasons stated in this memorandum opinion and order, their motion is granted.

## Facts [3]

Sweeney's troubles began in January 1983 when two students claimed that he exerted physical force against them. That accusation led to a series of meetings between Sweeney and then Principal Marilyn Howell ("Howell") [4] at which Howell told Sweeney his alleged actions were against school policy and asked that he apologize to

---

2. All further references to provisions of the Illinois School Code (the "Code," Ill.Rev.Stat. ch. 122) will take the form "Section—." That usage comports with the Illinois General Assembly's use of that word and of the symbol "§" in its enactments, even though the publisher of the Smith–Hurd annotated version of the Illinois statutes has chosen to shift to "¶" instead.

3. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in

this case Sweeney (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987)). One other procedural note in that respect: Defendants supported their motion with a statement of material facts as required by what was then this District Court's General Rule ("GR") 12(*l*) but has since been redesignated GR 12(m) (this opinion will employ the current designation). Sweeney then filed a response under current GR 12(n) (formerly GR 12(m)) as to whether each of defendants' asserted facts was undisputed or disputed, but he advanced no statement of additional facts of his own, as GR 12(n) contemplates.

4. Some of those meetings were also attended by the students and their parents.

the students and their families. Sweeney's response to Howell was that he disagreed with her interpretation of the school's corporal punishment policy and that he resented her request for an apology to the families.

In an effort to maintain discipline in his classroom, which he felt had been compromised by Howell's actions, Sweeney required the two students involved to read some provisions of the Code about the rights of teachers.[5] Howell told Sweeney she found that behavior unprofessional and violative of the Code of Ethics expressed in the school's faculty handbook. Howell then sent a memorandum to Sweeney memorializing the history of events beginning with the students' accusations and citing specific passages from the faculty handbook that she felt Sweeney had violated.

After receiving that memorandum Sweeney met with Bottoni and unsuccessfully asked for exclusion of the memorandum from his personnel file. Sweeney further asked that he be afforded the opportunity to meet with Board to find out what rights teachers have in disciplining students. On March 9, 1983 Bottoni advised Sweeney that arrangements would be made for Sweeney to address the Board. Bottoni then set up a meeting for March 15 among himself, Howell, Sweeney and a representative from the teacher's union to discuss Sweeney's discomfort with the use of the term "corporal punishment" rather than the term "teacher's rights" to categorize the issue (Bottoni Aff. Ex. 2). Sweeney arrived early for that meeting and told Bottoni (1) that he did not want to have any meeting until he talked with Board's President and (2) that Bottoni and he were not on "the same wave length". Bottoni then suspended Sweeney for 1½ days for his refusal to participate in that meeting.

Upon his return to work on March 17 Sweeney, at his own request, met with Howell. As a result of his conduct at that meeting, he was suspended again on March 18 for five days. Board then approved a Notice of Remedy for Sweeney on March 22. That remediation plan enumerated the incidents of Sweeney striking students and his acts of insubordination toward Howell. On March 29 Sweeney, represented by his attorney Mildred Haggerty, appeared before Board to contest the two suspensions, and Board approved both. Sweeney did not discuss his views on teacher's rights to discipline students with Board at that time. And after that meeting Sweeney made no further efforts to appear before Board to discuss his views on discipline and punishment.

No further incidents involving Sweeney took place for the balance of the 1982–83 school year. On July 19, 1983 Sweeney filed a federal court lawsuit (the "1983 Lawsuit") against Board, Bottoni and individual Board members, alleging that defendants' acts in suspending him and placing him on remediation had violated his First Amendment and due process rights. That case settled before trial, on October 18, 1984.

In June 1985 Sweeney's troubles resurfaced. Twice during that month he received memoranda from Howell regarding his use of corporal punishment against students, and he had a meeting with her where she told him that he was violating her instructions on corporal punishment and that she could not condone the use of force against the students. During the course of the 1985 summer break Bottoni met with a Board attorney, who suggested that Board should seek a psychiatric evaluation of Sweeney as a protective measure against potential liability should Sweeney use force against another student. On August 6, 1985 Board passed a motion requiring Sweeney to undergo a psychiatric evaluation as a condition to returning to class for the 1985–86 school year.

Sweeney returned to school on August 26, 1985 (the first day of the new school year) without having obtained the required

---

5. It is somewhat unclear from Sweeney's testimony (Dep. 21–23) whether that reading was compelled to be done aloud to the entire class or whether, as Howell Aff.Ex. 1 (her March 7, 1983 memorandum) indicates, it was done after class. For present purposes any such possible ambiguity is immaterial.

psychiatric evaluation. As a result a meeting was held that day between Bottoni and Sweeney, who was represented by the teacher's union president. At that meeting Sweeney reported that he had not undergone the evaluation and would not do so until he was certain that Board (and not simply Bottoni) had ordered the evaluation. Bottoni then suspended Sweeney with pay and told him that he could appeal that suspension to Board at its August 27 meeting. Sweeney declined to go before Board at that time.

Sweeney underwent an evaluation with a psychiatrist of his choice on September 4, 1985, and those results were reviewed by a Board-approved psychiatrist on September 17. Despite the psychiatrist's official determination that he was fit to return to work, Sweeney spent the balance of the school year on sick leave due to stress he attributed to the already-described series of events. When Sweeney indicated that he wished to return to school for the 1986–87 year, Board asked that he obtain another updated psychiatric evaluation before the start of the year.[6] Following evaluation by a Board-approved psychiatrist, Sweeney was allowed to and in fact did return to work for the 1986–87 school year—and that entire year passed without incident.

School year 1987–88 again witnessed difficulties between Sweeney and his class and, in turn, Sweeney and the administration. In dealing with discipline problems that arose in December 1987, Sweeney avoided striking the students and instead yelled at them, made them sit in the hallway and forced them to do push-ups in the classroom in lieu of detention after school. Sweeney was having a particularly hard time with student Jeff Wright and told then Principal John Davis that if the boy "takes a swing at me, he better make it good. Otherwise, they will take him out in a garbage bag" (Sweeney Dep. 62). Following those events Bottoni met with Sweeney on January 19, 1988, when Bottoni told Sweeney that he did not condone such behavior and that Sweeney was suspended again.[7] Formal minutes of the meeting were made available to Sweeney, and the next day Bottoni sent him a letter summarizing the meeting's activity and specifying the grounds of the suspension. Sweeney, with the aid of counsel, appealed the suspension at a February 2, 1988 Board meeting. Again Board sustained Sweeney's suspension and directed him to submit a psychiatric report to Board before his return to the classroom. At the conclusion of that suspension period—January 25, 1988—illness prevented Sweeney from returning to work, and he remained out for the balance of the school year.

After repeated Board requests for an updated psychiatric evaluation, on August 11, 1988 Sweeney's attorney provided a report from a privately retained psychiatrist. That report was forwarded to Board-approved psychiatrist Dr. Utley, who reviewed the file and on August 30 informed Board that Sweeney could return to work. Sweeney resumed his teaching duties on September 1.

On September 13, 1988 Board placed Sweeney on a six-month remediation plan, which it later (on January 24, 1989) extended to cover all of the 1988–89 school year. Due to a reduction in force Sweeney was honorably discharged on March 21, 1989.

Sweeney filed his original Complaint in this action on June 22, 1987 on the basis of the events that had transpired before that date. Factual allegations as to events after that date were added by way of the December 15, 1988 Supplemental Complaint. Each complaint contains four counts[8] that allege that the repeated suspensions and psychiatric evaluation requirements constituted:

---

6. Sweeney's first psychiatric evaluation in September 1985 identified a need for further treatment, and the renewed evaluation was ordered to see that Sweeney had followed up on that recommendation.

7. Defendants GR 12(m) ¶ 64 refers to that meeting as a "formal hearing," but Sweeney objects vigorously to that characterization. More on that subject later in the text's due process discussion.

8. For simplicity this opinion will use arabic numbers rather than roman numerals to identify them.

*Count 1:* a violation of Sweeney's right to free speech under the First Amendment[9] (this and Count 2[10] are brought under 42 U.S.C. § 1983 ("Section 1983"));

*Count 2:* a violation of Sweeney's right to due process under the Fourteenth Amendment;

*Count 3:* intentional infliction of emotional distress; and

*Count 4:* a violation of the Code.

### First Amendment Claim

■ Count 1 alleges that Board and Bottoni suspended Sweeney, required him to undergo psychiatric evaluations and placed him on a remediation plan in retaliation for his having filed the 1983 Lawsuit[11] in violation of the First Amendment. Defendants urge that claim is legally deficient because Sweeney's 1983 Lawsuit did not relate to a matter of public concern and therefore is not protected by the First Amendment. To that end they rely on the basic principle articulated in *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1982):

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

Indeed *Connick, id.* at 146–47, 103 S.Ct. at 1689–90 teaches that unless the allegedly protected speech or conduct can be characterized as touching on a matter of public concern, it is inappropriate for a federal court to scrutinize the reasons for the employer's adverse personnel decision.

Defendants correctly identify Sweeney's burden of showing that his speech or conduct is constitutionally protected (*Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)).[12] In light of Sweeney's inability to make that showing, they argue, summary judgment is appropriate without further inquiry. P.Mem. [7][13]

---

9. As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the First Amendment's underlying provisions (which of course impose limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

10. Frustratingly, the Supplemental Complaint does not precisely track the organization of the Complaint in terms of the substance of each count. Although Counts 1 and 3 in the two pleadings match, the Supplemental Complaint inverts Counts 2 and 4, with Count 2 alleging violations of the Code and Count 4 alleging due process violations. To minimize the repetitiveness that would be created if each count had to be identified on every occasion, this opinion will treat the organizational structure of the Complaint as controlling and will frequently refer to the substantive claims solely by their count numbers in the original Complaint.

11. Complaint Count I ¶ 24 identifies two categories of alleged First–Amendment–protected speech that assertedly provoked defendants' retaliation. Here are the allegations:
   a. Plaintiff was retaliated against for having exercised his First Amendment Right to redress grievances in the courts.
   b. Plaintiff was retaliated against for his continued criticism to [sic] administrators for their violation of Board policy regarding corporal punishment.

While the 1983 Lawsuit is clearly documented in the materials before this Court, any statements referred to in Count I ¶ 24(b) remain a mystery. Defendants' GR 12(m) statement makes no reference to such continuing criticism (which presumably had to take place after resolution of the 1983 Lawsuit, because all of Sweeney's critical statements before that time were the subject of that first suit and cannot be relitigated here). And as stated in n. 3, Sweeney filed no GR 12(n) statement of additional facts. Thus there is no evidence of such continuing criticism in the record (see *Tatalovich v. City of Superior*, 904 F.2d 1135, 1138–39 (7th Cir.1990) and *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989)) that could suffice to form the basis of a retaliation claim. Hence this opinion focuses only on the First Amendment issues surrounding the 1983 Lawsuit.

12. In the summary judgment context, that translates into Sweeney's need—aided by reasonable inferences—to demonstrate a material factual issue in that respect. This opinion of course employs that lower standard, rather than requiring Sweeney to "show" (that is, to prove) the required facts.

13. Though Sweeney's memorandum inexplicably employed no pagination, this Court has added page numbers in brackets to aid in specific citation.

counters that the 1983 Lawsuit did touch on matters of public concern:

> [T]he public certainly had an interest in the school's discipline policy, and the administration of it, and Plaintiff's having been allowed to speak to the Board would have contributed to debate on the subject, whether Plaintiff so intended or not.

That is just not the law.

*Hesse v. Board of Education of Township High School District No. 211*, 848 F.2d 748, 752 (7th Cir.1988) (emphasis in original) has reviewed and summarized our Court of Appeals' teaching on this subject:

> This Court has noted that "there is a difference between criticism directed at the institution in general and disputes with which the complainant has an intimate personal involvement." *Eggers v. Phillips*, 710 F.2d 292, 318 (7th Cir.1983) (en banc). The fact that a public employee's "verbalized reason for [his lack of cooperation] was a criticism of the institution does not significantly alter the essentially private nature of the dispute." *Id.* at 318. This court has recently reaffirmed its stance that even though an expression may inherently deal with a matter of public concern, the *Connick* test " 'requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?' " *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987) (quoting *Linhart v. Glatfelter*, 771

F.2d 1004, 1010 (7th Cir.1985)). The Eleventh Circuit has also noted that "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Ferrara v. Mills*, 781 F.2d 1508, 1515–16 (11th Cir.1986).

Sweeney's complaint in the 1983 Lawsuit (Bottoni Aff. Ex. 11) leaves no doubt but that the *point* of Sweeney's entire effort was to seek redress of and compensation for alleged wrongs done *to him individually* by his employer.

None of the indicia of a claim aimed at raising an issue of public concern was present in the 1983 Lawsuit. Sweeney brought his case wholly individually—and *not*, for instance, on behalf of a class of teachers who had been systematically barred from bringing their concerns to Board's attention. He sought only damages and a declaration that due process had not been afforded *to him* in the specific instances of his suspensions. He did *not* seek any injunctive relief aimed at forcing Board and Bottoni to change their procedures of dealing with teachers' grievances. Nor did he seek a court order to force Board and Bottoni to allow him to address Board on the matter of teachers' rights regarding student discipline. Indeed pecuniary gain to, and potentially more amenable working conditions for, Sweeney would have been the *only* result of his successful prosecution of the 1983 Lawsuit. Because that lawsuit thus clearly sought betterment of Sweeney's own career and *not* advancement of any cause,[14] it does not constitute

---

**14.** Not only is that fact obvious from the text of the 1983 Lawsuit's complaint, but Sweeney also directly confirmed that his objectives were personal in the course of his deposition in this case, while negating with equal directness any desire to raise the issue as a matter of public concern. Sweeney Dep. 82 is highly illuminating:

> Q. You wanted to see the board because of your own conflict with Mrs. Howell?
> A. I felt threatened.
> Q. Did you go to newspapers in the community?
> A. No, I haven't, because I am not in this to make extreme waves. I just want what is right for me, and I want my rights to be upheld.

Q. Basically you wanted to keep it a private matter?
A. I didn't want to sink the school system on [sic] anything. I wanted what was right.
Q. You didn't think there was any pressing issue of public policy that had to be resolved or anything like that?
A. No. I know there was a difference in opinion between her and I [sic] and later it became between Mr. Bottani [sic] and myself [sic] so it just kept snowballing and I tried to compromise many times with those people and it was not very successful.

While that questioning clearly refers to Sweeney's activities before he filed the 1983 Lawsuit, there is absolutely no evidence to suggest that

protected speech (see *Yatvin v. Madison Metropolitan School District,* 840 F.2d 412, 419 (7th Cir.1988)). Hence it cannot support the legal weight that Count 1 attempts to rest on its shoulders.

Because the just-completed analysis is sufficient to dispatch the Count 1 First Amendment claim completely, this opinion need not pass on the validity of defendants' further argument (D.Mem. 8):

> While the actions of these defendants were in no way related to plaintiff's filing of the prior lawsuit, the Board would be justified in imposing disciplinary measures against plaintiff as a result of his truly baseless action in filing the prior suit.

In that respect *Yatvin,* 840 F.2d at 418 (citation omitted) does say:

> [I]f the charges are truly baseless the employee's action in filing them may be a form of misconduct justifying disciplinary measures not rightly deemed retaliatory.

But that principle is of limited value where, as here, there was never a decision on the merits of the first action. In *Yatvin* a jury had rejected the underlying discrimination action upon which the retaliation claim was founded, while here we have only a settlement in advance of trial—indicating nothing one way or the other about the merits of the original claim. To determine whether defendants had the *right* to discipline Sweeney for filing the 1983 Lawsuit, this Court would have to evaluate the underlying merits of a case, involving hotly disputed facts, that was settled six years ago. That path is not worth taking just to provide a potential alternative ground for decision.

It should also be mentioned that Sweeney has moved to strike various portions of (1) Howell's affidavit, (2) Bottoni's affidavit and exhibits and (3) defendants' GR 12(m) statement—all on the basis that they represent an attempt to litigate the facts of the 1983 Lawsuit. In fact none of that infor-

mation, regardless of what defendants may have intended, has been used by this Court for that purpose. But this Court will not strike those portions of the record. As the discussion at the beginning of this section makes clear, the events that preceded filing of the 1983 Lawsuit are relevant to this litigation to the extent that they cast light on Sweeney's non-public-concern objectives in filing that suit.

### Due Process Claims

Complaint Count 2 and Supplemental Complaint Count 4 assert that defendants' actions in suspending Sweeney, requiring him to undergo psychiatric exams as a condition of employment and placing him on a remediation plan violated Sweeney's Fourteenth Amendment due process rights. Success on that claim would require that Sweeney have a property right[15] in employment uninterrupted by suspension, employment free of required psychiatric evaluations and employment free of remediation orders. If he has any such rights, the focus shifts to what process the state actors must provide before depriving him of such rights and then to whether they did afford him the required process.

This opinion will address those issues separately as to each asserted property interest. In that respect the familiar teaching of *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) as to the origin of property rights proves helpful:

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure benefits and that support claims of entitlement to those benefits.

1. Suspensions

Illinois does grant a tenured teacher a property interest in employment without

---

the lawsuit was anything more than a continuation of his personal grievance.

**15.** Of course the Due Process Clause also protects interests in life and liberty. But Sweeney has not suggested that this case implicates either of those interests.

suspension. While affirming that a school board has authority to suspend a teacher under Section 10–20.5 that is separate and different from its authority to dismiss a teacher under Section 24–12, *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.*, 118 Ill.2d 389, 406, 113 Ill.Dec. 915, 923, 515 N.E.2d 1222, 1230 (1987) (citations omitted when not part of the text sentence itself) stated:

> Although tenured teachers who face suspension are not entitled to a section 24–12 hearing, they are nevertheless entitled to procedural due process. In *Wilson v. Bishop* (1980), 82 Ill.2d 364, 369, 45 Ill. Dec. 171, 412 N.E.2d 522, this court noted that "[t]he United States Supreme Court has emphasized that due process of law, at a minimum, prohibits the deprivation of property without providing notice and an opportunity for a hearing appropriate to the nature of the case." The Supreme Court has stated that " 'the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved.' " In the case before us, the plaintiff's interest is to avoid unfair or mistaken suspension and the adverse consequences which could follow such a suspension. The defendant's interests are to effectively manage its schools and their employees and to avoid undue administrative burdens and expenses.

■ Defendants' suspension policy ("Board Policy # 5602," Bottoni Aff.Ex. 3) requires the Superintendent, before suspending any teacher, to meet with that teacher, explain the nature of the alleged misconduct, allow the teacher to respond and inform the teacher of his or her right to appear in person before Board for review of any suspension. Additionally the policy requires (1) that the Superintendent forward a written report of the meeting to Board, (2) that the teacher receive written notification within a reasonable time of the

suspension and the reasons for it and (3) that the teacher be notified in writing of his or her right to request (by submitting a written request within 5 days of the beginning of the suspension period) a hearing before Board to review the suspension. Because those procedures provide both for notice and an opportunity to be heard both pre- and post-deprivation they are "commensurate with the sanction the defendant[s] sought to impose upon plaintiff and, therefore, satisfied the requirements of procedural due process" (*Spinelli*, 118 Ill.2d at 407, 113 Ill.Dec. at 923, 515 N.E.2d at 1230).[16] And although such a state court holding is of course only informative and not at all definitive as to the proper construction of the *federal* Due Process Clause, the *Spinelli* approach is impeccable in those terms as well. Board's specified procedures did afford Sweeney all the process he was due (*Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542–43, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985)).

■ At the final step of the analysis, the record shows beyond question that Bottoni comported with those procedures in each of the two suspensions that Sweeney now challenges. Both suspensions will be briefly recapitulated from that perspective.

First, on August 26, 1985 Sweeney was suspended for not having obtained the psychiatric evaluation ordered by Board on August 6. On August 9 Sweeney had been informed by letter that such a report would be required *before* he could return to the classroom. When he reported to school on August 26 without the report, Bottoni called a meeting at which Sweeney was present and was represented by the teachers' union president. At that meeting Bottoni reviewed Board's psychiatric examination requirement—and Sweeney did not conform even then, instead saying that he had to consult with counsel before stating whether he would comply with the requirement. All that being so, Bottoni acted in

---

**16.** *Spinelli* upheld suspension procedures slightly different from the ones at issue here. However, Board's policy now under consideration provides for substantially the same kinds of protection that were available in *Spinelli*—while at the same time allowing the Superintendent some flexibility in imposing the sanction quickly where necessary to effect its remedial purpose.

conformity with the prescribed procedure when he (1) suspended Sweeney with pay [17] until the latter tendered the report, (2) told Sweeney that Bottoni would report the events of the meeting to Board at its regularly scheduled session the next day and (3) invited Sweeney to attend that meeting. Sweeney asked for postponement of that meeting, but Bottoni did not agree. Instead Bottoni again told Sweeney that he was being suspended in accordance with Board Policy # 5602 and that he should inform Board in writing within five days if he wanted to appear before it (Bottoni Aff.Ex. 18). On August 28 Bottoni sent Sweeney a letter reviewing the events of the meeting and setting out the reasons for the suspension. Sweeney did not appear before the Board on August 27 as invited, nor did he tender any written notification of a desire to meet with it.

■ Similar formalities were observed in connection with the January 1988 suspension. On January 19 Bottoni held a meeting at which Sweeney was present and was represented by the teachers' union president, where the parties discussed the discipline problems that had occasioned the meeting. At the close of that meeting Bottoni told Sweeney that he was being suspended, again with pay, pursuant to Board Policy # 5602 and that if Sweeney wanted to appeal the suspension to Board Bottoni would waive the five-day written request requirement as long as he was made aware of Sweeney's desire before the previously-scheduled January 26 Board meeting (Bottoni Aff.Ex. 19). Bottoni sent Sweeney a letter summarizing the events of the meeting and specifying the grounds for suspension on January 20. Sweeney appealed that suspension to Board, which sustained Bottoni's action on February 2.

In sum, Sweeney plainly received all the process due him in connection with his two

suspensions. No constitutional violation can be made out in that respect.

2. Psychiatric Evaluations

■ Sweeney's due process argument as to the psychiatric evaluation requirements cannot negotiate even the first hurdle on the track to liability: He has no state law property right to employment free of required psychiatric examinations. Quite to the contrary, the Code specifically contemplates that Board may require such examinations of its teachers. *Tetmeir v. Board of Education of School District No. 149*, 5 Ill.App.3d 982, 985–86, 284 N.E.2d 380, 382–83 (1st Dist.1972) held that Section 24–5 includes psychiatric examinations in the following authorization:

The board may from time to time require an examination of an employee by a physician licensed in Illinois to practice medicine and surgery in all its branches.

In reaching that result *Tetmeir, id.* said:

In the school setting the mental well-being of teachers can be even more important than physical good health. We do not believe the legislature failed to perceive this when the statute was enacted. Any other construction would leave a school board with no recourse against a teacher who displayed tendencies toward mental instability, and there is no reason to wait until behavior becomes so aberrational as to be itself grounds for dismissal before any action is taken.... As long as the selection of a competent psychiatrist by the Board is done in an unbiased way, the teacher has an obligation to submit to an examination.

Sweeney's employment was expressly subject to Board's statutory right to require psychiatric examinations when deemed necessary. Board's decision to exercise that right cannot be considered a deprivation of property.

17. Indeed, the fact that both suspensions were *with pay,* therefore posing no threat to Sweeney's "means of livelihood" (see *Cleveland Board of Education,* 470 U.S. at 543, 105 S.Ct. at 1494), shifts the balance of interests used to determine what process is due even further in favor of defendants. But this Court need not and does

not here find that suspensions with pay necessarily do *not* implicate a state law property right at all, despite the indication to that effect in *Fender v. School District No. 25, Arlington Heights,* 37 Ill.App.3d 736, 743–44, 347 N.E.2d 270, 276–77 (1st Dist.1976).

### 3. Remediation Plan

■ Sweeney's due process argument based on the allegedly arbitrary and capricious imposition of the 1988 remediation plan can fare no better than his other constitutional claims. Far from granting teachers a property right to employment free from the imposition of such plans, Section 24–12 affirmatively *requires* Board to provide a remediation plan as a specific element of the process due before Board may dismiss a tenured employee. Only if such a remediation plan does not accomplish its intended purpose and results in a Section 24–12 dismissal hearing does an employee *then* have an opportunity to show that the remediation plan was unnecessary or vexatious. But Sweeney has pointed to nothing that suggests that a teacher has a constitutionally protected right to be free from such orders in the first instance—and common sense dictates that such a right does not exist.

\* \* \*

All three of Sweeney's due process claims have been examined and found wanting. Defendants' summary judgment motion as to Complaint Count 2 and Supplemental Complaint Count 4 is granted.

### Pendent State Claims

With Sweeney's First Amendment and Due Process Clause claims having succumbed to this summary judgment motion, *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) teaches that the proper course is to dismiss—without prejudice, of course—both Count 3's intentional infliction of emotional distress claim and the statutory claim under the Code, as asserted in Complaint Count 4 and Supplemental Complaint Count 2. *Gibbs, id.* at 726–27, 86 S.Ct. at 1139 (citations omitted) explains the rationale behind such a ruling:

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

With no federal claim surviving to serve as the source of their attachment, those remaining Counts are therefore dismissed without prejudice.

### Conclusion

Because there are no genuine issues of material fact regarding the constitutional claims of Complaint Counts 1 and 2 and Supplemental Complaint Counts 1 and 4, defendants are entitled to a judgment as a matter of law on those counts. They are dismissed with prejudice. In light of that disposition, all the other Counts are dismissed without prejudice. This action is therefore dismissed in its entirety.