Will BROWN, Plaintiff–Appellant,

v.

AMERITECH CORP., Defendant–Appellee.

No. 97–1391.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 2, 1997.

Decided Oct. 29, 1997.

Gerald A. Goldman, Arthur R. Ehrlich (argued), Jonathan C. Goldman, Chicago, IL, for Plaintiff–Appellant.

Benjamin Ghess (argued), Ameritech Corp., Chicago, IL, for Defendant–Appellee.

Before ESCHBACH, EASTERBROOK and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Will Brown was a building cable splicer technician with Illinois Bell during the days before the famous break-up of American Telephone & Telegraph Company in 1984, which came about as a result of the Modified Final Judgment (MFJ) in the case of *United States v. AT & T*, 552 F.Supp. 131 (D.D.C. 1982), *aff'd, Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). One consequence of the MFJ was a reconfiguration of the regional telephone businesses in the United States. Illinois Bell became part of Ameritech Corporation, the Regional Bell Operating Company for a number of Great Lakes states. These changes affected Brown's job in a way that he deemed discriminatory. The district court granted summary judgment for Ameritech on Brown's claims of race discrimination under 42 U.S.C. § 1981, based upon a job reassignment and his subsequent early retirement. We affirm.

Brown, an African–American, began work in 1968 for what was then called Illinois Bell, in his position as "building cable splicer technician," a job which was highly skilled and required him to set up telecommunications systems in buildings. His job was classified as Wage Group I, the highest paid group under the pertinent collective bargaining agreement. After Ameritech split off from AT & T in 1984, however, most of the build-ing cable splicer technician positions were assigned to the former mother company. Brown, who stayed with Ameritech, found himself in the new position of "cable splicing technician," also a Wage Group I job. His new position involved a greater variety of tasks, including splicing and waterproofing covering, working in manholes, trenches, on poles and on ladders, lifting or moving heavy objects, and directing the work of an apprentice. Brown had several medical conditions, including back and knee problems and severe asthma, which required him to avoid some of those duties.

In 1987, the Illinois Commerce Commission (ICC) ordered Ameritech to install Network Interface Devices for all of its customers. Given the massive nature of the undertaking, the ICC gave Ameritech ten years in which to complete the work. The record does not show how quickly the project progressed during the early years, but in 1994, Ameritech decided to create Customer Access Closure (CAC) teams in order to finish the job. These teams included both newly hired (and low skill) employees and cable splicer technicians who were supposed to train the new hires and oversee their work. All cable splicer technicians assigned to CAC teams remained in Wage Group I and retained all their employment benefits. Some of them, though apparently not all, were chosen to be "lead persons" on the team; the lead persons received a pay increase.

Clifford Hill, Brown's immediate supervisor and another African–American, decided to put Brown on a CAC team. This shift in job responsibilities meant that Brown lost his company truck, because individual employees did not need trucks in the CAC positions. Instead, the CAC teams worked in a limited geographic area, using two trucks per team. Brown was quite displeased with his new assignment. He contacted his union, the International Brotherhood of Electrical Workers (IBEW), Local 165, and complained that the CAC assignment was demeaning and below his skill level. The union responded that the collective bargaining agreement permitted this assignment and it could do nothing. Brown then made the same complaint to

Glenn Jevert, a White man and Hill's supervisor. According to Brown's deposition, Jevert then called the benefits department to see if Brown was eligible for Ameritech's early retirement program. The response was affirmative, which prompted Jevert to say, "You can take it and you are out of here."

Brown now argues that he interpreted this comment as an ultimatum: do the CAC work or retire. About two months later, however, Brown retired on his birthday under Ameritech's Supplemental Income Protection Plan (SIPP). Under SIPP, Brown received $25,-000 worth of benefits and a $193,737.10 pension—the result of a sweetener that added three years to his age and years of service for purposes of the pension calculation. At the time, Brown signed a form affirming that it was his understanding that the SIPP retirement program was completely voluntary. About a year after his retirement, he filed this lawsuit under 42 U.S.C. § 1981, alleging that his assignment to the CAC team was discriminatory and that he was constructively discharged.

Although Brown admits that the CAC assignment technically fell within his job description, he argues that it was nonetheless discriminatory because it fell so far below his proven skills and experience with the company. He likens it to a decision to take a senior trial lawyer and to banish her to the law library writing background memoranda, or to bury her in a warehouse full of documents doing fact research on a case: both would be work lawyers are expected to do, but both are examples of tasks usually assigned to the junior person on the totem pole. Furthermore, Brown asserts that "[v]irtually all employees assigned to the CAC teams at this time [i.e.1992 to 1994] were black." He drew this conclusion from his frequent observations of the CAC teams congregating at work before they went out on job assignments and working in the field as Brown drove past in his company truck. These observations also formed the basis of Brown's antipathy to the kind of work the teams performed: it normally involved nothing more complicated than attaching a new network interface box to the wall of a house or building and screwing it in, reattaching the wires from the old box to the new device, and clearing out old or dead wires.

Ameritech offered several reasons to explain why Brown received the CAC assignment. First, through his affidavit, Hill said that he chose Brown because of his experience and because he thought the CAC work would accommodate Brown's medical restrictions. Jevert's affidavit is to the same effect. Ameritech also noted again that it was under an obligation from the ICC to complete the Network Interface task it had received in 1987.

■ The magistrate judge, who was hearing this matter by consent under 28 U.S.C. § 636(c), found that Brown's claims relating to the reassignment foundered on two grounds: first, he failed to introduce evidence that would show that the CAC assignment was a materially adverse employment action, and second, he was unable to point to any evidence that would tend to show Ameritech's reasons for the job action were pretextual. At oral argument, Brown spent most of his time attacking the first of these reasons, along the lines we have already described. This avails him nothing, however. Even if we were to accept his theory that the changed set of duties, while all still within his job description, amounted to an adverse action, see *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir.1994), Ameritech is still entitled to prevail if he is unable to cast doubt on its proffered reasons for the action. See *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 919–20 (7th Cir.), *cert. denied*, —— U.S.——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996).

■ With respect to the validity of Ameritech's reasons, Brown has little to say. He wonders why, if the ICC imposed its requirement on Ameritech, the company had not completed the task by 1994, but he does not contest that work remained to be done with the interface devices. He disputes Hill and Jevert's assertions that he was assigned to the CAC team because of his experience, since it appears that no mention was made of making him a lead worker. (The magistrate judge's opinion is contradictory on this point, but as the case comes to us from a summary judgment adverse to Brown, we accept

Brown's version of the conversation.) But again, Brown does not dispute the fact that his planned CAC assignment never got off the ground: he was out the door before anyone could decide whether or not to make him a lead worker. Brown also finds implausible Ameritech's claim that the position was designed in part as a medical accommodation, since (he claims) Ameritech had not gone out of its way to accommodate him in the past. He does not dispute, however, that he had certain medical restrictions or that the CAC position would have accommodated them.

None of Brown's arguments suffices to show that Ameritech's proffered reasons were pretextual, in the sense this court uses the term. See *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995) ("a lie, specifically a phony reason for some action"). The balance of Brown's brief recounts Brown's personal belief that Ameritech systematically treated its White employees better than its African-American employees. In particular, Brown asserts that Ameritech gave the White cable splicers the more complex and prestigious interior building cable work, and it gave the African-American employees the demeaning CAC work. He admits that Ameritech showed that for the years 1994 and 1995 seven out of the 32 employees assigned to CAC teams were White, while the other 28 were African-American. The district court correctly concluded that this was, in essence, an effort by Brown to raise a disparate impact case, because none of the information threw any light on his particular situation. Furthermore, what is most notable about Brown's allegations is the lack of concrete information about the racial composition of the relevant part of Ameritech's work force. Brown was represented by counsel, and if he had been able to show why general workforce demographics were pertinent to his theory, he could have conducted discovery on the matter. He did not, nor did he provide the court with an affidavit under Fed. R.Civ.P. 56(f) asking for more time when the summary judgment motion was ready for decision. On this record, Brown simply failed to raise a genuine issue of fact that might have permitted a jury to find Ameri-

tech's reasons for his job assignment pretextual.

Brown's claim of a constructive discharge was also correctly dismissed. The conversation he had with Jevert falls far short of the kind of action that would support this theory. A constructive discharge claim requires the plaintiff to show that his conditions of work were so intolerable, in a discriminatory way (for this kind of case), that a reasonable person would have been compelled to resign. *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996). The aggrieved person must also seek redress at the workplace, unless he encounters some kind of aggravating situation. *Id.* Brown's only actions at Ameritech after the conversation with Jevert were to opt for the SIPP early retirement program and to sign the papers indicating that his decision was voluntary. This is, if anything, the opposite of what a person seeking to cure an intolerable work environment would have done.

Like the district court, we do not find force or coercion in Jevert's words against Brown in any event. Jevert never threatened Brown with job loss, with pay reduction, or with any other loss of benefits. All Brown needed to do to remain was to reject Jevert's suggestion. This is not, contrary to Brown's argument, anything like the situation in *Parrett v. City of Connersville*, 737 F.2d 690 (7th Cir.1984). The Connersville chief of detectives in that case had literally been banished to a closet with no telephone, and had seen all duties stripped from him, in response to his investigation of the daughter of a prominent citizen. *Id.* at 693–94. In our case, Brown was asked to perform real duties, that Ameritech needed, as a senior person (even if not the "lead" person) on the team. There was no reason for Brown to think that he would spend the rest of his life on CAC teams, since the project was due to be completed in 1997. Summary judgment for Ameritech was also entirely proper on the constructive discharge count.

The judgment of the district court is AFFIRMED in all respects.