In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-2522 & 00-2999

GARY TOWNSEND,

Plaintiff-Appellee,

and

ALEX RILEY,

Plaintiff-Appellee, Cross-Appellant,

v.

PAUL VALLAS and MARILYN F. JOHNSON,

Defendants-Appellants, Cross-Appellees,

and

CHICAGO SCHOOL REFORM BOARD OF TRUSTEES,
also known as BOARD OF EDUCATION OF THE
CITY OF CHICAGO, a municipal corporation,

Defendant, Cross-Appellee.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 8080--William T. Hart, Judge.

ARGUED JANUARY 19, 2001--DECIDED July 9, 2001

Before FLAUM, Chief Judge, and POSNER and
RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.  Plaintiffs Gary
Townsend and Alex Riley brought this
action under 42 U.S.C. sec. 1983
("Section 1983") to challenge certain
employment actions taken after the
drowning death of a student in a Chicago
public school. Named as defendants were
the Chicago School Reform Board of
Trustees ("the Board") and two
administrators who were sued in their
individual capacities: Paul Vallas, the
Board's Chief Executive Officer, and
Marilyn Johnson, the General Counsel of
the Board and the head of the Board's Law
Department. The district court granted
summary judgment to the defendants with
respect to Mr. Riley's claim that he had
been deprived of a liberty interest in

his occupation without due process of law. The court denied summary judgment with respect to Mr. Townsend's claim that the defendants infringed his property right in a tenured teaching position without due process of law. The court further ruled that Mr. Vallas and Ms. Johnson were not protected by qualified immunity with respect to that claim.

For the reasons set forth in the following opinion, we affirm the district court's grant of summary judgment to the defendants regarding Mr. Riley's claim. However, we reverse the judgment of the district court on the qualified immunity issue.

I

BACKGROUND

A.  Facts

On April 14, 1998, a number of freshmen students at Chicago's Julian High School ("Julian") participated in their seventh-period physical education class. During that month, the class was engaged in swimming instruction. Mr. Townsend, a tenured physical education instructor at Julian, taught the class; Mr. Riley, a part-time lifeguard and swimming coach at the school, was responsible for lifeguard duties during that class period./1 When class ended at 2:28 p.m., the students typically would have been dressed in their school attire and would have proceeded to their eighth-period classes.

On the next morning, April 15, 1998, the body of Lloyd Wilson, Jr., a student in that seventh-period class, was found at the bottom of the school's swimming pool. It was unclear how this tragic death had occurred. According to one theory, he had drowned during the swimming class while no one was watching. Another possibility was that Wilson left the pool with the other students at the end of class, but later returned to the pool and drowned at that time. Because of this uncertainty regarding the cause of Wilson's death, Ms. Johnson, acting on behalf of the Board, retained Martin Boyer Company ("Boyer") to investigate. The Chicago Police Department also began its own investigation into the accident.

On the same day that Wilson's body was

discovered, the Board took action with regard to Mr. Townsend and Mr. Riley, the two members of the Julian staff who had a supervisory role in Wilson's seventh-period class. The Board told Mr. Townsend that he would be transferred to the Board's Central Office. This action was taken pursuant to a Board policy that calls for such a transfer, at least on a temporary basis, when a teacher's conduct is at issue in a situation implicating student safety. While at the Central Office, Mr. Townsend had minimal duties; he sat at a desk and occasionally made telephone calls or was asked to pack boxes for a move. Mr. Townsend did receive his full teacher's salary for the entirety of his transfer. However, he also had been assigned to coach fall, winter and spring extracurricular sports at Julian, coaching duties that provided him with some additional income./2 During the time that Mr. Townsend worked out of the Central Office, he did not receive that additional income from coaching. Unlike his teaching position, Mr. Townsend's coaching duties were not protected by tenure. Mr. Townsend remained at the Central Office until February 8, 1999, when he returned to his teaching position at Julian and resumed his coaching duties./3

The Board also took immediate action with respect to Mr. Riley on the same day that Wilson's body was discovered. Mr. Riley was told not to report to Julian for work until given further notice. At no point in the future was Mr. Riley contacted by the Board with instructions to return to work.

Nearly two weeks after Wilson's death, the Board received the investigative reports from both Boyer ("the Boyer report") and the Chicago Police Department ("the police report"); each contained the results of interviews with Julian faculty members and students. The Boyer report noted that its author was not able to interview Mr. Townsend because of Mr. Townsend's subsequent hospitalization after the drowning due to a stress-related condition. The Boyer report does indicate that its author spoke with Mr. Riley, who said that, after the swimming class, he had discovered a pile of clothes near the pool, which later were found to belong to Wilson./4 Mr. Riley then claimed to

have brought the clothes to Mr. Townsend's attention, but explained that Mr. Townsend told him to leave them by the pool and that someone later would come to retrieve them. The Boyer report goes on to state that, of the students that its author interviewed, two girls reported seeing Wilson enter the locker room at the end of the swimming class, although many others could not remember seeing him at the class' end. Attached to the Boyer report are summaries of interviews with school security guards who claimed that Wilson was being bullied by another student around the time of his death and summaries of interviews with two students who related that Wilson was depressed and often spoke of killing himself. Lastly, the Boyer report contains summaries of interviews with a number of Julian faculty members, who indicated that they had entered the pool area after the swimming class was over on April 14 and looked in or around the pool, but saw no one there. Ultimately, the Boyer report concludes that, although the cause of Wilson's death may never be known, "[i]t seems the body was most likely in the pool [at the class' end] and no one looked with the degree of concern to see it." R.31, Ex.8 at 105. The report states that Mr. Riley, "if he is to be believed, did not see the body in the pool, and therefore did not perform his duties as expected" and that his failure to react with greater concern when finding the clothing was "not correct when only students were in the pool area, and if clothes were found then either a student is still in the area, or a student went to class without clothes." Id. at 106.

The police report also contains summaries of interviews with Julian faculty, staff and students./5 Included in those summaries is the content of an interview with Mr. Riley, in which he again acknowledged that he found a pile of clothing after the class and that he subsequently checked the pool area for students and saw no one there. The police report states that Mr. Riley, after inquiring of the students in the locker room and finding that no one was missing clothes, surveyed the pool area again and then simply left the clothes where he found them. The report also contained the results of an interview with Mr. Townsend. Focusing on the events

occurring after the class was over, it notes that Mr. Townsend "related that he then checked the pool. Coach Riley mentioned something about clothes near the shallow end of the pool. Coach Townsend then went o[n] to coach a baseball practice." R.31, Ex.9 at 5.

A few weeks after receiving these reports, Ms. Johnson participated in an interview with a reporter for the Chicago Sun-Times regarding the issue of Wilson's death. In the article that followed, the author notes that, in light of the events surrounding the death, Ms. Johnson's recommendation was that Mr. Townsend should be suspended without pay for thirty days and that Mr. Riley should not continue to be employed by the Board. The article explains that Ms. Johnson believed that these actions should be taken due to Mr. Townsend and Mr. Riley's "failure to perform duties." R.34, Ex.12.

Mr. Riley did not receive a hearing regarding his role in the circumstances surrounding Wilson's death. In August 1998, Mr. Riley made a request to Julian's principal that he be allowed to return to work. He was told by the principal that the Board had decided that Mr. Riley no longer could be employed at Julian or in any other Board facility. Mr. Riley continued to remain employed at this time as a swimming instructor for the City Colleges of Chicago, a position he had held since April 1998. He did not seek any further employment to replace the salary that he had earned as a part-time member of Julian's staff.

Mr. Townsend was never actually suspended after his reassignment to the Central Office on April 15, 1998. On June 10, he was served with charges, issued by Mr. Vallas and Ms. Johnson, which claimed that Mr. Townsend had violated multiple Board rules in connection with Wilson's death and informed him that the Board would seek a thirty-day suspension as a result. A hearing was set for June 12, but the Board requested a continuance. That hearing was rescheduled for July 24; however, on that date the Board decided to again postpone the hearing until discovery was completed in a wrongful death action that had been filed by Wilson's estate.

On the same date that the hearing was

postponed for the second time, the Board communicated to Mr. Townsend that it would reinstate him to his prior status at Julian in August 1998, the beginning of the next school year. However, after Wilson's death, a great deal of unrest had befallen Julian. A new principal was having difficulty managing the staff, and disciplinary problems among students were on the rise. Moreover, Wilson's drowning had caused psychological upset among students and anger on the part of parents who wanted the Board to take satisfactory measures to bring closure to the incident. As these problems increased and as the beginning of the 1998-99 school year drew closer, the defendants met with Blondean Davis, the Chief of Schools and Regions for the Chicago public schools. Davis expressed concern that the return of Mr. Townsend to Julian at that time would contribute significantly to the volatile climate at the school. The defendants agreed with Davis' concerns and, as a result, the three determined that Mr. Townsend's return to Julian would be delayed. Ultimately, on February 8, 1999, Mr. Townsend was reinstated to his teaching and coaching duties at Julian. No hearing has been held regarding the disciplinary charges that were filed against Mr. Townsend, and no suspension has been imposed against him.

B.  District Court Proceedings

The plaintiffs filed a complaint in the district court, alleging violations of Section 1983 against the Board and against Mr. Vallas and Ms. Johnson in their individual capacities. Mr. Riley claimed that the defendants deprived him of a liberty interest in his occupation without due process by stigmatizing him with allegations that he was responsible for Wilson's death and by not allowing him a hearing to clear his name. Mr. Townsend maintained that he was deprived of a property interest in his tenured teaching position without due process when the Board reassigned him to the Central Office and did not provide him with a timely hearing regarding the charges against him./6 In response, the defendants filed a motion for summary judgment on all of the plaintiffs' claims.

The district court granted the defendants' summary judgment motion as to

Mr. Riley's claim. It held that Mr. Riley could not demonstrate that a liberty interest in his occupation was infringed by the statements that Ms. Johnson made to the Chicago Sun-Times. The court explained that Mr. Riley had failed to satisfy one of the elements necessary to make such a claim because he had not demonstrated a tangible loss of other employment opportunities as a result of the allegedly stigmatizing statements. The court explained that Mr. Riley had put forward no evidence that he had sought employment after Ms. Johnson's statements appeared and that he had been turned down due to those statements. It also noted that the evidence showed that Mr. Riley continued to remain employed as a swimming teacher with the City Colleges of Chicago after the statements were made.

The court, however, did not grant summary judgment with respect to Mr. Townsend's procedural due process claim. First, it held that, based on Illinois state law, Mr. Townsend had a property interest in being assigned to a certified teaching position; it determined that his temporary assignment to the Central Office (a position that involved no teaching duties) constituted a "removal" from his teaching position under Illinois law and, therefore, was a deprivation of that property right. Next, the court, reading our decision in Swick v. City of Chicago, 11 F.3d 85 (7th Cir. 1993), to require an economic impact on a plaintiff's employment to establish the deprivation of a constitutionally protected property interest, found such a loss in Mr. Townsend's inability to earn additional income from his coaching duties during his reassignment period.

The court next determined that the defendants could be said to have violated Mr. Townsend's due process rights. In its view, Mr. Townsend had been suspended from his teaching position with pay when he was reassigned to the Central Office. Because that action had been taken initially due to the Board's significant interest in overseeing student safety, the court held that the lack of a hearing before the reassignment did not violate due process. However, the court went on to note that over time, the Board continued to keep Mr. Townsend at the Central Office not because of student

safety concerns, but because of the turmoil at Julian. In the district court's view, at that point there was no governmental interest that justified keeping Mr. Townsend out of teaching, and he should have been returned to a teaching position at another school, if not at Julian. The court also held that, even if the defendants did have an adequate justification for keeping Mr. Townsend at the Central Office during this time, he was entitled to a reasonably prompt hearing after his reassignment.

Lastly, the court held that Mr. Townsend's claim could also have succeeded on the rationale that his assignment to a position with very minimal duties at the Central Office constituted a constructive discharge actionable as a property deprivation.

The court then determined that Mr. Vallas and Ms. Johnson were not entitled to qualified immunity. It held that, prior to April 1998, Illinois law was well established that Mr. Townsend's reassignment to the Central Office was a removal from his teaching position that constituted a constitutionally cognizable deprivation of property. It further held that the law of this court was well established that Mr. Townsend's loss of coaching income was a sufficient pecuniary loss to trigger due process protections. The court also explained that, although the law was not well established in April 1998 as to when a public employee who is suspended with pay must receive a post-suspension hearing, the law was clear that some sort of meaningful time limit applied, one that was exceeded by the period during which Mr. Townsend was reassigned to the Central Office. Lastly, the court noted that, as to the constructive discharge rationale, the law also was clearly established prior to Mr. Townsend's reinstatement that this conduct amounted to such a discharge even when an employee did not quit his job. As a result, the court ruled that Mr. Vallas and Ms. Johnson were not entitled to qualified immunity on Mr. Townsend's procedural due process claim.

After the district court denied both parties' motions to reconsider, Mr. Riley then appealed the decision regarding his

liberty interest claim. Mr. Vallas and Ms. Johnson filed a separate interlocutory appeal on the issue of whether they are entitled to qualified immunity as to Mr. Townsend's due process claim.

## II

## DISCUSSION

### A. Standard of Review

We review a district court's decision to grant or deny summary judgment de novo. See Biblia Abierta v. Banks, 129 F.3d 899, 902 (7th Cir. 1997). Summary judgment is properly entered in favor of the moving party when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, we must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. See Mt. Sinai Hosp. Med. Ctr. v. Shalala, 196 F.3d 703, 707 (7th Cir. 1999); Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996).

### B. Mr. Riley's Liberty Interest Claim

Mr. Riley claims that the defendants deprived him of a liberty interest in his occupation when they dismissed him from his position at Julian and then made statements to the Chicago Sun-Times, in the interview given by Ms. Johnson, to the effect that Mr. Riley should not be rehired by the Board due to his "failure to perform duties" in the events surrounding Wilson's death. R.37 at 9. To set forth a violation of Section 1983, Mr. Riley "must show that 'the conduct complained of was committed by a person acting under color of state law' and 'this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" Strasburger v. Board of Educ., Hardin County Cmty. Unit Sch. Dist. No. 1, 143 F.3d 351, 355 (7th Cir. 1998)

(quoting Parratt v. Taylor, 451 U.S. 527, 535 (1981)). In Board of Regents v. Roth, 408 U.S. 564 (1972), the Supreme Court held that the state may infringe a plaintiff's liberty interest when, in declining to rehire an employee, it makes a "charge against him that might seriously damage his standing and associations in his community" that places his "good name, reputation, honor, or integrity . . . at stake" or when, in failing to rehire, it imposes on the plaintiff "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." Id. at 573. The Court has emphasized that, to implicate a liberty interest, such charges of defamation must be coupled with the alteration of a legal status, such as the loss of an employment position. See Paul v. Davis, 424 U.S. 693, 708-10 (1976); see also Ratliff v. City of Milwaukee, 795 F.2d 612, 625 (7th Cir. 1986). We have interpreted Roth to indicate that a liberty interest may be threatened in two types of situations when the government removes someone from an employment position: "(1) the individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, alcoholism, disloyalty, Communism or subversive acts; or (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities." Munson v. Friske, 754 F.2d 683, 693 (7th Cir. 1985). Mr. Riley claims that, in conjunction with his termination, Ms. Johnson's statements/7 deprived him of a liberty interest in pursuing the occupation of his choice; he maintains that the statements both seriously damaged his good name, reputation, honor and integrity and imposed a stigma upon him that foreclosed future employment opportunities./8 He charges that the Board's failure to provide him with a name-clearing hearing after these statements were made violated his due process rights.

We have explained that, when an employee claims that a government employer has infringed his liberty to pursue the occupation of his choice, the employee must show that (1) he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publically disclosed and (3) he suffered a tangible loss of other employment opportunities as

a result of public disclosure. See Head v. Chicago Sch. Reform Bd. of Trustees, 225 F.3d 794, 801 (7th Cir. 2000); Strasburger, 143 F.3d at 356; Johnson v. Martin, 943 F.2d 15, 16 (7th Cir. 1991). We also have noted that, at the heart of every claim that an employer has infringed an employee's liberty of occupation, is a charge that the "circumstances of the discharge, at least if they were publically stated, had the effect of blacklisting the employee from employment in comparable jobs." Colaizzi v. Walker, 812 F.2d 304, 307 (7th Cir. 1987)./9 In such cases, the employee's good name, reputation, honor or integrity must be called into question in a manner that makes it virtually impossible for the employee to find new employment in his chosen field. See Head, 225 F.3d at 801; Olivieri v. Rodriguez, 122 F.3d 406, 408 (7th Cir. 1997); Lashbrook v. Oerkfitz, 65 F.3d 1339, 1348-49 (7th Cir. 1995); Ratliff, 795 F.2d at 625.

The district court held that Mr. Riley could not satisfy the third part of the three-part test set forth above because he did not make a showing that prospective employment opportunities have been foreclosed to him due to Ms. Johnson's allegedly defamatory statements. We agree. Mr. Riley admits that, after being dismissed from Julian, he sought no additional employment opportunities and therefore was not turned down by any potential employer due to Ms. Johnson's statements./10 Moreover, although he claims that those statements have made him virtually unemployable in his chosen profession, Mr. Riley was not discharged from his position as a swimming instructor with the City Colleges of Chicago after the statements were made, and, as far as the record shows, he continues to work in that position today.

Mr. Riley argues that an employee should not be required to show that the defamation in question caused the tangible loss of employment opportunities; he maintains that such a requirement diminishes the rights of public employees and serves no real purpose. However, regarding such liberty interest claims, the Supreme Court noted in Roth that "[i]t stretches the concept too far to suggest that a person is deprived of liberty when he simply is not

rehired in one job but remains as free as before to seek another." Roth, 408 U.S. at 575. As a result, the Court indicated that a cognizable constitutional claim required proof that an employer's actions significantly foreclosed an employee's future employment prospects to a degree amounting to a deprivation of liberty. See id. at 574 n.13 ("Mere proof, for example, that [the plaintiff's] record of non-retention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'"). In line with the Supreme Court's direction, we have required that a plaintiff's claim establish that hisfuture employment opportunities have been curtailed so significantly that a liberty interest was implicated. See Zaky v. United States Veterans Admin., 793 F.2d 832, 840 (7th Cir. 1986) (explaining that a court should not simply assume, based on a plaintiff's assertions, that a wide variety of opportunities have been foreclosed). Therefore, a requirement that the employee show that he suffered a tangible loss of other employment opportunities is consistent with the case authority insisting that a liberty interest claim not be unduly speculative. When a plaintiff cannot make such a showing, his liberty interest claim must fail. See Lashbrook, 65 F.3d at 1349; Fittshur v. Village of Menomonee Falls, 31 F.3d 1401, 1409-10 (7th Cir. 1994); Vukadinovich v. Board of Sch. Trustees of the Michigan City Area Schs., 978 F.2d 403, 413 n.7 (7th Cir. 1992); Oshe v. Hughes, 816 F.2d 1144, 1150 (7th Cir. 1987), vacated on other grounds, 485 U.S. 902 (1988); Munson, 754 F.2d at 694.

Mr. Riley also argues that he has put forward sufficient evidence to demonstrate that he is all but unemployable in his chosen profession due to the Board's actions. He asserts that, when he approached Julian's principal in August 1998 and requested his reinstatement at the school, the principal told Mr. Riley that the Board had forbidden her from employing him and had made it clear that Mr. Riley could not work for any Board facility. Mr. Riley maintains that precluding him from working in any school in the Chicago public school system should suffice to demonstrate that his liberty of

occupation has been violated. In support of that claim he relies upon Larry v. Lawlor, 605 F.2d 954, 956 (7th Cir. 1978), a case in which a plaintiff applied to the Civil Service Commission ("the Commission") and requested to be placed on a list of eligible applicants for employment consideration by various departments of the federal government. In Larry, we held that the plaintiff had demonstrated a tangible loss of employment opportunities sufficient to implicate a liberty interest. See id. at 958-59. The Commission's investigative report, which rated the plaintiff's application ineligible due to his unsatisfactory employment record and his habitual use of alcohol, barred him from all federal employment for up to three years. See id. at 956. Notably, the court relied upon Justice Jackson's comment in Anti-Fascist Committee v. McGrath, 341 U.S. 123 (1951), that a bar from government employment is "no small injury" when "government employment so dominates the field of opportunity." Id. at 958 (quoting McGrath, 341 U.S. at 185 (Jackson, J., concurring)); cf. Perry v. F.B.I., 781 F.2d 1294, 1299-1303 (7th Cir. 1986) (en banc) (distinguishing Larry as a case involving the absolute ban of all government employment for a significant time period).

In this case, Mr. Riley has not demonstrated a bar to his employment opportunities similar to the magnitude of that present in Larry. As the district court noted, Mr. Riley did not actually seek employment at any other Board facilities. See R.44 at 3 (ruling on motions for reconsideration). Even assuming that he was banned from employment with the Chicago public schools, the court noted that "the Chicago school system is one of many school systems in the metropolitan area and state" and is "an entity distinct from the City of Chicago, the Chicago Park District, and numerous other municipal entities in the metropolitan area." Id. at 4 n.4. With many potential employment opportunities as a swimming instructor still available to him and with no demonstration that the Board's comments have prevented him from obtaining one of those jobs, Mr. Riley cannot demonstrate that his liberty has been infringed in the manner required by the case law. Indeed, the evidence demon

strates that, contrary to Mr. Riley's assertions of unemployability, he continues to hold a job with the City Colleges of Chicago as a swimming instructor. Cf. Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524, 531 (7th Cir. 2000) (concluding that plaintiff's renewal as principal afteremployer's stigmatizing conduct meant he could not show that it was "virtually impossible" for him to find employment in chosen field); Oshe, 816 F.2d at 1150 (holding that evidence that plaintiff found employment after termination demonstrated that plaintiff could not show liberty deprivation); Munson, 754 F.2d at 694 (concluding that plaintiff's claim that he was "virtually unemployable" was undercut by evidence that he was able to secure part-time and then full-time employment after termination by employer). As a result, we agree with the district court that Mr. Riley's liberty interest claim must fail.

C. Mr. Vallas and Ms. Johnson's Claim of Qualified Immunity

We now turn to Mr. Vallas and Ms. Johnson's assertion that they are entitled to qualified immunity for their actions with respect to Mr. Townsend's due process claim. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Whether an official may be held personally liable for his or her unlawful actions turns on "the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Wilson, 526 U.S. at 614 (quotation marks and citations omitted); see also May v. Sheahan, 226 F.3d 876, 881 (7th Cir. 2000). In order to be "clearly established," the contours of a right asserted must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. See Anderson v. Creighton, 483 U.S. 635, 640 (1987); May,

226 F.3d at 881.

As a general rule, a "court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson, 526 U.S. at 609 (citation and internal quotation marks omitted); see also Saucier v. Katz, No. 99-1977, 2001 WL 6722265, at *4-5 (U.S. June 18, 2001); County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998); Jacobs v. City of Chicago, 215 F.3d 758, 766 (7th Cir. 2000)./11 Deciding the constitutional question before addressing whether a right was clearly established "promotes clarity in the legal standards for official conduct, to the benefit of both . . . officers and the general public." Wilson, 526 U.S. at 609.

To establish a violation of Section 1983, Mr. Townsend claims that the defendants deprived him of a property interest in his tenured teaching position without due process of law. "Procedural due process claims require a two-step analysis. The first step requires us to determine whether the plaintiff has been deprived of a protected interest; thesecond requires a determination of what process is due." Strasburger, 143 F.3d at 358. In this case, Mr. Townsend points to Illinois state law to establish the property interest at issue. See Pleva v. Norquist, 195 F.3d 905, 914 (7th Cir. 1999). The district court concluded that, according to Illinois law, Mr. Townsend "had a property interest in being assigned to a certified teaching position" and that his temporary reassignment "to the Central Office without any teaching duties therefore constituted removal from his teaching position, a deprivation of his property interest." R.37 at 20. We respectfully part company from the district court on this point. In our view, the Board's actions did not deprive Mr. Townsend of a protected property interest.

The parties agree that Mr. Townsend, having served the proper probationary period, was a tenured teacher and that, under Illinois law, he may not "be removed except for cause." 105 ILCS 5/34-85; see also Shegog v. Board of

Educ. of City of Chicago, 194 F.3d 836, 837 (7th Cir. 1999). Consequently, Mr. Townsend had a protected property interest in his teaching position. See Gleason v. Board of Educ. of City of Chicago, 792 F.2d 76, 79 (7th Cir. 1986); Patkus v. Sangamon-Cass Consortium, 769 F.2d 1251, 1263 (7th Cir. 1985).

   The district court also concluded that Mr. Townsend suffered a deprivation of this property right because the defendants' actions constituted removing him from his teaching position. In evaluating this aspect of the district court's decision, we begin by noting that the purpose of the tenure provisions of the Illinois Code is "to assure teachers of experience and ability a continuous service and rehiring based upon merit rather than failure to be rehired forreasons that are political, partisan or capricious." Hansen v. Board of Educ. of Sch. Dist. No. 65, 502 N.E.2d 467, 471 (Ill. App. Ct. 1986). In line with this purpose, the word "removed" as used in the tenure statutes has been interpreted not to be limited to instances of complete termination, but to instead encompass any reduction in the extent of employment. See Hansen, 502 N.E.2d at 472; Caviness v. Board of Educ. of Ludlow Cmty. Unit Sch. Dist. No. 2, Madison County, 375 N.E.2d 157, 158-59 (Ill. App. Ct. 1978) (noting that otherwise, "a board could merely nibble away and reduce one's employment until economic necessity forced the tenured teacher to resign"). As a result, a teacher is "removed" from his position when the length of his contract or the amount of hours associated with his teaching duties are permanently reduced. See Birk v. Board of Educ. of Flora Cmty. Unit Sch. Dist. No. 35, Clay County, 472 N.E.2d 407, 409 (Ill. 1984) (per curiam) (teacher's contract reduced from ten months to nine months); Caviness, 375 N.E.2d at 158-59 (teacher's contract reduced from full-time to part-time); see also Costello v. Governing Bd. of Lee County Special Educ. Ass'n, 623 N.E.2d 966, 978 (Ill. App. Ct. 1993) (same). However, a transfer or reassignment is not a removal when it does not move a teacher out of a position for which he has received tenure as a certified employee. See Bart v. Board of Educ. of City of Chicago, 632 N.E.2d 39, 42-43 (Ill. App. Ct. 1993) (holding that because Section 34-84 of school code

referred only to "teachers and principals" and plaintiff was transferred from assistant principal position to teacher position, plaintiff did not have tenure in assistant principal position for which he was not certified); Newby v. Board of Educ., Lake Zurich Cmty. Unit Sch. Dist., No. 95, 368 N.E.2d 1306, 1307 (Ill. App. Ct. 1977) (holding that reassignment from guidance counselor position to teaching position did not deprive plaintiff of property interest when plaintiff only acquired tenure as certified employee of the school district).

In determining that Mr. Townsend was "removed" from his teaching position in this case, the district court placed significant reliance on Hansen v. Board of Educ. of Sch. Dist. No. 65, 502 N.E.2d 467 (Ill. App. Ct. 1986). In that case, the plaintiff was a tenured music teacher who, due to poor job performance, was permanently reassigned to an "itinerant" position that required him to monitor students while they used school buses, ate and attended study hall. Hansen, 502 N.E.2d at 470. The new position involved no substantive teaching responsibilities. See id. The Board of Education authorized the hiring of a replacement teacher and froze the plaintiff's salary at the previous year's level. See id. The salary freeze was imposed, the superintendent testified, because the plaintiff's new duties were not worth more money. See id. The Illinois Appellate Court held thatbecause, under the applicable tenure law, 105 ILCS 5/24-12,/12 the plaintiff was required to be certified as a teacher, he had acquired tenure as a teacher. See id. at 472. As a result, because the plaintiff's reassignment had deprived him of all teaching responsibilities, the court found the Board's action to be the equivalent of a removal or dismissal under the tenure law. See id.

We do not believe that the circumstances of Mr. Townsend's case are similar to those in Hansen or to the other cases previously noted in which Illinois courts have found a teacher to be "removed" from his teaching position. Each of those cases involved the permanent or indefinite shelving of a tenured teacher in a new, lesser type of employment status with tangible economic

ramifications. See Costello, 623 N.E.2d at 978; Hansen, 502 N.E.2d at 470; Birk, 472 N.E.2d at 408; Caviness, 375 N.E.2d at 158. In Mr. Townsend's case, however, the Board only temporarily transferred him from his teaching position, pending an investigation regarding the death of a child, and it provided Mr. Townsend with his full teacher's salary while it did so. Within two months, the Board alerted him that it would not seek more than a thirty-day suspension in the matter; soon after that, it indicated that he would be returned to his teaching position at Julian in the future. This type of temporary reassignment in the wake of a serious safety incident is a foreseeable aspect of the duties of being a teacher. We do not believe that Illinois courts would say that the defendants "rearrange[d] teaching positions or assignments in ways which defeat the rights of tenured teachers and circumvent the purpose and spirit of the tenure laws." Hansen, 502 N.E.2d at 471. Consequently, such a temporary removal from the classroom, specifically circumscribed for an important educational purpose, does not constitute a removal from a teaching position that can be characterized as the deprivation of a cognizable property right.

In Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc., 515 N.E.2d 1222, 1229-30 (Ill. 1987), the Illinois Supreme Court interpreted Section 24-12's "removal or dismissal" language not to include temporary suspensions, but indicated that tenured teachers who face suspension are entitled to procedural due process. Both Section 24-12 and Section 34-85 (at issue in Mr. Townsend's case) provide that, in the process of seeking to remove or dismiss a teacher, if the Board deems it necessary, it may suspend that teacher pending a hearing, but if acquitted the teacher shall not suffer any loss of salary by reason of the suspension. See 105 ILCS secs. 5/24-12 & 5/34-85. Following Spinelli, there is some authority for the proposition that Illinois grants a tenured teacher a property interest in employment without suspension. See Sweeney v. Board of Educ. of Mundelein Consol. High Sch. Dist. 120, Lake County, Ill., 746 F. Supp. 758, 765 (N.D. Ill. 1990). Although the Board told Mr. Townsend it would seek his suspension, he

never actually was suspended in this case, nor do we believe that the sort of temporary removal from teaching duties, without significant economic impact, involved in this case can be considered as tantamount to a suspension. We therefore need not decide definitively whether, as some courts have indicated, Illinois teachers only have a property right in not being suspended without pay, such as was the case in Spinelli. See Sweeney, 746 F. Supp. at 766 n.17; Massie v. East St. Louis Sch. Dist., #189, 561 N.E.2d 246, 249-50 (Ill. App. Ct. 1990); Combs v. Board of Educ. of Avon Ctr. Sch. Dist. No. 47, 498 N.E.2d 806, 810 (Ill. App. Ct. 1986); Fender v. School Dist. No. 25, Arlington Heights, Cook County, 347 N.E.2d 270, 276-77 (Ill. App. Ct. 1976).

Even if we were to consider Mr. Townsend's temporary reassignment as tantamount to a suspension, under the existing case law, a suspension with pay would not constitute the deprivation of a property right subject to federal constitutional protections. See Gilbert v. Homar, 520 U.S. 924, 929-30 (1997); Board of Educ. v. Loudermill, 470 U.S. 532, 544-45 (1985); Levenstein v. Salafsky, 164 F.3d 345, 351 (7th Cir. 1998); Crim v. Board of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 546-47 & n.25 (7th Cir. 1998). In this case, during Mr. Townsend's temporary reassignment to the Central Office, he received his full teacher's salary. The district court found that this meant that "[e]ssentially, [Mr. Townsend] was suspended with pay." R.37 at 24-25. However, the court further noted that, while at the Central Office, Mr. Townsend lost the opportunity to receive pay for his duties as a coach of extracurricular sports. In the district court's view, this loss of the opportunity to earn additional income, not attributable to his tenured position as a teacher, requires that we characterize this situation as a suspension without pay triggering federal due process protections. In our view, the temporary loss of this possibility for additional income does not warrant the characterization given the situation by the district court. We have recognized that removal or suspension from a tenured position might produce indirect economic effects that trigger the protection of

the Due Process Clause. See Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524, 530-31 (7th Cir. 2000); Swick v. City of Chicago, 11 F.3d 85, 86 (7th Cir. 1993). Nevertheless, we do not believe that the temporary loss of this possibility for additional income is the sort of deprivation that triggers the protection of federal due process. We have stated that deprivations of property "are not actionable under the Constitution unless they are atypical and significant in relation to the inevitable 'deprivations' that people suffer as a result of contractual disputes and the other ordinary frictions of life." Baerwald v. City of Milwaukee, 131 F.3d 681, 683 (7th Cir. 1997). We believe that Mr. Townsend's loss of income from coaching jobs not protected by tenure rights was a foreseeable possibility for any teacher in this situation, one that would not impact a constitutionally cognizable property right. Cf. Baerwald, 131 F.3d at 683 (noting that "it cannot be that every dispute over sick leave, or every interruption in pay because of an injury or illness, or every denial of a fringe benefit . . . is, unlike discharge, or suspension without pay, or permanent refusal to reinstate, a constitutional controversy just because the employee is a tenured public employee.") (internal citations omitted); Altman v. Hurst, 734 F.2d 1240, 1242 (7th Cir. 1984) (holding that plaintiff's expectation interest in scheduling of vacation time was "not the stuff of constitutional torts"); Brown v. Brienen, 722 F.2d 360, 365 (7th Cir. 1983) ("Disputes over overtime, over work assignments, over lunch and coffee breaks do not implicate the great objects of the Fourteenth Amendment.").

There also was some discussion in the district court's opinion and at oral argument about whether Mr. Townsend could have been placed temporarily in a teaching position at another school during the time when his return to Julian was delayed, or whether he ever sought such an action. Both the complaint and the demand letter that Mr. Townsend's attorney sent to the Board during his reassignment indicate only that he wished to be returned to his teaching position at Julian. See R.1 at 7 & R.34 at Ex.7. Assuming that the matter is properly before us, we do not think that the

defendants' decision to delay Mr. Townsend's return to Julian until calm had returned to the educational environment ought to alter our basic analysis. The temporary nature of the removal made any burden on the tenure rights of Mr. Townsend within the foreseeable bounds of his expectations.

As an alternative ground for its decision, the district court concluded that Mr. Townsend could claim a deprivation of a property interest on the theory that the Board's actions amounted to a constructive discharge. A constructive discharge is a situation in which an employer, without firing an employee, makes his working conditions so miserable that a reasonable person would be compelled to resign. See Hunt v. City of Markham, 219 F.3d 649, 655 (7th Cir. 2000); Brown v. Ameritech Corp., 128 F.3d 605, 608 (7th Cir. 1997). On appeal, Mr. Townsend maintains that the district court's conclusion was correct and analogizes this case to that described in Parrett v. City of Connersville, 737 F.2d 690, 694 (7th Cir. 1984). In Parrett, an Indiana police detective was permanently reassigned to a "line captain" position. Id. at 693. He had a property right in the latter position and could be removed only for cause and only after notice and a hearing. See id. at 694. Nevertheless, in this position, the plaintiff was assigned no police duties, was forced to sit in a windowless room that was formerly a storage closet and spent his entire shift at a desk with nothing to do. See id. at 693. This "enforced idleness" caused him to suffer a nervous collapse and prompted his retirement from the police force. Id. We held that such conditions amounted to a constructive discharge, as the "[e]nforced idleness was not only a humiliating counterpoint to [the plaintiff's] years as detective chief but would if prolonged have depreciated his professional skills to the point where it would have been difficult for him to work his way back . . . to a responsible position." Id. at 694; see also Wozniak v. Conry, 236 F.3d 888, 889 (7th Cir. 2001) (holding that plaintiff university professor could survive summary judgment on constructive discharge claim where university removed him from tenured faculty position, barred him from teaching future classes, cancelled his research funds and

permanently reassigned him to manage a Web site), cert. denied, No. 00-1570, 2001 WL 378861 (U.S. June 11, 2001); Levenstein, 164 F.3d at 351 (finding that constructive discharge was adequately alleged where university forbid plaintiff, a physician with a reputation spanning several continents, from seeing patients for eleven months and then permanently reassigned him to a job reviewing old medical training videotapes from his home, forcing him to resign).

We believe that the facts of this case are far different than those in Parrett and that they do not support recovery on the ground that Mr. Townsend was constructively discharged. As an initial matter, Mr. Townsend did not quit his job during the period of the transfer. Although this factor is not fatal to his constructive discharge claim, see Wozniak, 236 F.3d at 890; Hunt, 219 F.3d at 655, in conjunction with the circumstances surrounding his temporary reassignment, it does indicate that Mr. Townsend knew that the Board's actions were not of the kind that would make it difficult for him "to work his way back . . . to a responsible position." Parrett, 737 F.2d at 694; cf. Wozniak, 236 F.3d at 890 (holding that constructive discharge could be shown where permanent loss of tenure track position deprived plaintiff not only of the possibility of tenure but also of research support, scholarly publications, professional recognition and chance to obtain consulting work). As we have noted, Mr. Townsend was told less than two months after his reassignment to the Central Office that the Board would only seek his suspension without pay for thirty days due to the incident. Soon after, the Board assured him that his reassignment would not be permanent and that he would be returned to teaching at Julian when classes began in the fall. Indeed, Mr. Townsend was in fact later reinstated to his teaching position. As a result, Mr. Townsend was aware that he did not face the prospect of an indefinite or permanent reassignment to a job that provided little professional responsibility. See Brown, 128 F.3d at 608 (constructive discharge not shown by plaintiff, in part because he knew that undesirable reassignment was temporary and had "no reason . . . to think that he would spend the rest of his life" on it).

Lastly, unlike the situation in Parrett, where action was taken against the plaintiff due to a personal vendetta against him, see Parrett, 737 F.2d at 693, here the defendants faced a difficult problem. Mr. Townsend's transfer came after a serious incident that had cost a child his life, an event that may have occurred during the seventh-period swimming class that Mr. Townsend taught. Evidence from investigatory reports suggested that, after the class, Mr. Townsend had been alerted to the fact that a student's clothes were left lying on the deck of the pool, but that he took no action and went on to coach a baseball practice. Additionally, although Mr. Townsend's eventual return to Julian was delayed, that delay was due to significant unrest at the school, in part related to the events surrounding Wilson's death. Cf. Ulichny v. Merton Cmty. Sch. Dist., 249 F.3d 686, 703 (7th Cir. 2001) (indicating that seriousness of disciplinary incident and "political fallout" from it, prompting school board to reassign plaintiff from principal to assistant principal position, was a factor militating against finding that circumstances of action were "objectively unreasonable" and amounted to constructive discharge). These circumstances made Mr. Townsend's temporary reassignment a reasonable response to a difficult situation, not the type of objectively unreasonable action by an employer that may often lead to a finding of a constructive discharge.

Although there may be situations in which a "temporary" reassignment from an employment position would extend for such a long or indefinite period of time and under circumstances that are particularly onerous as to give rise to a constructive discharge claim, this case hardly presents that scenario. Consequently, we cannot agree with the district court's conclusion that Mr. Townsend can make out a claim for constructive discharge.

Because Mr. Townsend has not established that he was deprived of a federally protected property right, Mr. Vallas and Ms. Johnson are entitled to qualified immunity. See Wilson, 526 U.S. at 609; County of Sacramento, 523 U.S. at 841 n.5.

Conclusion

We affirm the judgment of the district court that the defendants were entitled to summary judgment with regard to Mr. Riley's claim of the deprivation of a liberty interest without due process of law. However, as to Mr. Vallas and Ms. Johnson's claim that they were entitled to qualified immunity regarding Mr. Townsend's allegation of the deprivation of a property interest without due process, we believe that Mr. Townsend cannot establish the violation of a constitutional right regarding that issue. We therefore reverse the judgment of the district court on the qualified immunity issue and remand this case to the district court for proceedings consistent with this opinion. The defendants may recover their costs in this court.

AFFIRMED in part, REVERSED and REMANDED in part

FOOTNOTES

/1 Mr. Riley's position was not a tenured position nor was it accompanied by other civil service protections.

/2 Mr. Townsend earned $3,000 for coaching varsity basketball, $2,500 for coaching varsity baseball and $2,500 for coaching freshman/sophomore football during the respective seasons for those sports. See R.31, Ex.6 at 24. In his deposition, Mr. Townsend claimed that he missed all three seasons as a result of his transfer to the Central Office, but then explained that he did coach baseball in the spring of 1999 after his return to Julian. See id. at 24-25. The district court noted that this coaching income "presumably represents a relatively small percentage of Townsend's annual income." R.37 at 25.

/3 Mr. Townsend's time away from his teaching and coaching duties at Julian lasted from April 15, 1998, until the end of the 1997-98 school year and from the beginning of the 1998-99 school year until February 8, 1999, when Mr. Townsend was reinstated. Just as he would not have been required to report to Julian during the summer of 1998, Mr. Townsend was not required to work at the Central Office during that summer.

/4 As the district court noted, see R.37 at 7 n.4, although the Boyer report maintains that a summary of its author's interview with Mr. Riley is attached to it, no such summary appears in the

copy provided in the record, see R.31, Ex.8. The court explained that the copy of the Boyer report in the record was missing a "Page 3"; it assumed that this page contained a summary of Mr. Riley's interview that was consistent with the statements attributed to Mr. Riley in the Boyer report's text.

/5 The information contained in these interview summaries is similar to that found in the Boyer report. For example, some of the students again noted that they saw Wilson exit the pool at the end of class, and others remembered seeing Wilson's clothing and I.D. card near the pool after the class' end. One student related that, upon seeing the clothing and the I.D. card, he brought them to the attention of Mr. Riley, who told the student to put the I.D. card on Mr. Riley's desk. Other students interviewed did not remember seeing Wilson or the clothes at the end of class. Many students also remembered that Wilson stayed in the shallow end of the pool during most of the class because he did not know how to swim. Additionally, the police report includes the statement of one teacher who claimed to have checked the pool area after the class and saw no students in or around the pool.

/6 Mr. Townsend also claimed in the district court that he was a victim of retaliation, in that he was punished for attempting to exercise his constitutional due process rights. The district court dismissed this retaliation claim, noting that Mr. Townsend could point to no significant change in his treatment by the defendants after Mr. Townsend's attorney, in a letter received by the defendants on August 27, 1998, invoked due process and demanded Mr. Townsend's return to Julian. Mr. Townsend does not challenge the district court's decision as to the retaliation claim in this appeal.

/7 The district court found that although Ms. Johnson made these statements, Mr. Vallas did not deny joining them or otherwise being responsible for them. It also noted that, because Mr. Vallas was a policymaking official for the Board, the Board was responsible for the comments as well. The parties do not dispute this point on appeal.

/8 Mr. Riley may make such a liberty interest claim even though he did not have a property interest in his position of public employment. See Harris v. City of Auburn, 27 F.3d 1284, 1286 (7th Cir. 1994); Johnson v. Martin, 943 F.2d 15, 16 (7th Cir. 1991).

/9 In Colaizzi, we went on to explain that, because the interest protected in such cases was occupational liberty rather than liberty of reputation,

mere defamation coupled with a firing is not sufficient to state such a claim. See Colaizzi v. Walker, 812 F.2d 304, 307 (7th Cir. 1987). As a result, regardless of whether an employee charges that, in the course of firing him, an employer defamed him by either (1) damaging his good name, reputation, honor or integrity or (2) by imposing a stigma or other disability upon him that foreclosed other employment opportunities, the employee must show that, because the charges have been made, it is unlikely that anyone will hire him for a comparable job in the future. See id.

/10 In a deposition, Mr. Riley said that he did not seek such replacement employment because he "was content and happy where [he] was," R.31, Ex.4 at 73, not because he believed that such efforts would be futile.

/11 We have recognized that this rule is not an ironclad one. See Campbell v. Groves, ___ F.3d ___ (7th Cir. 2001) (Nos. 00-1426 & 01-1851) (release pending). However, this case implicates none of the concerns noted in Kalka v. Hawk, 215 F.3d 90 (D.C. Cir. 2000), and Horne v. Coughlin, 191 F.3d 244 (2d Cir. 1999), that might warrant a deviation from the usual methodology. See Pearson v. Ramos, 237 F.3d 881, 884 (7th Cir. 2001).

/12 The tenure laws involving removal for cause that are applicable to Mr. Townsend are those found in Article 34 of the Illinois School Code, which apply to districts with over 500,000 inhabitants. See 105 ILCS secs. 5/34-84 & 5/34-85. The tenure laws applying to districts with under 500,000 inhabitants are found in Article 24 of the Code. See 105 ILCS secs. 5/24-11 & 5/24-12. The defendants argue that because Hansen (and many of the other Illinois cases defining "removal") interpreted the terms "removed" or "removal" under a different provision of the Code, Article 24, the district court should not have relied on it to interpret the meaning of those terms as used in Article 34. They contend that because of differences in the definition of a teacher in the two sets of statutes and because the Board has greater control over Chicago schools than do similar entities in other districts of the state, Hansen and other cases interpreting those terms as they apply to Article 24 are therefore not applicable to Mr. Townsend's case. The district court disagreed, noting that both sets of statutes provide that a tenured teacher may not be "removed" but for cause. See R.44 at 5 (ruling on motions for reconsideration). The court also noted that at least one Illinois court has relied upon cases involving Article 24 in determining whether a tenured teacher had a property interest in his position as assistant principal under

Sections 34-84 and 34-85 of the Code, such that he could state a claim for wrongful removal from that position. See id. (citing Bart v. Board of Educ. of the City of Chicago, 632 N.E.2d 39, 42-43 (Ill. App. Ct. 1993)). Lastly, the court recognized that Section 24-11 defined a "teacher" as a school district employee required to be certified under laws relating to the certification of teachers. See id. This definition was important in Hansen's determination that a teacher is "removed" from his position when he is transferred to a position that does not require a certified teacher. The court noted that Section 34-85 did not contain an express definition of "teacher," but pointed to other law indicating that Chicago public school teachers are required to be certified and that they receive tenure as a teacher, as distinct from tenure in other positions. See id.; see also 105 ILCS secs. 5/34- 83, 5/34-84 & 5/34-85; Bart, 632 N.E.2d at 42. As a result, the court found that the definitions of a "teacher" in both statutes were similar enough for purposes of comparison.

We are inclined to agree with the district court, for the reasons that it cited, that Illinois cases defining "removal" under Article 24 can be of assistance in this matter. The defendants point to no case authority suggesting that this approach is incorrect. However, we note that even taking into account those Article 24 cases, and particularly the holding of Hansen, we do not believe that Mr. Townsend was "removed" from his teaching position under Illinois law.